BRYAN A. MERRYMAN (SBN: 134357)
bmerryman@whitecase.com
JAMES K. LEE (SBN: 162350)
jklee@whitecase.com
EARLE MILLER (SBN: 116864)
emiller@whitecase.com
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA  90071
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329

Attorneys for Plaintiff
THE EXPORT-IMPORT BANK OF KOREA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| THE EXPORT-IMPORT BANK OF KOREA, an agency or instrumentality of the Republic of Korea, <br><br> Plaintiff, <br><br> v. <br><br> ASI CORPORATION, a Delaware corporation; ASI COMPUTER TECHNOLOGIES, INC., a California corporation, <br><br> Defendants. | Case No.  2:16-cv-2056 <br><br> **COMPLAINT FOR:** <br><br> **(1) FRAUD;** <br><br> **(2) NEGLIGENT MISREPRESENTATION; AND** <br><br> **(3) NEGLIGENT SUPERVISION** |

Plaintiff The Export-Import Bank of Korea ("**KEXIM**") complains of defendants and alleges as follows:

1.      In October 2014, a company called Moneual, Inc., a manufacturer of computers and home appliances, shocked the nation of South Korea when it was exposed for perpetrating one of the biggest cases of fraud in Korea's history.  A Korean court described the scandal as a crime that "gravely undermined the trust of the society in general toward the financial system" and "caused a real risk that may put a damper on the trade insurance system and export finance system."  Through fraudulent means, Moneual received loans exceeding $3 billion and victimized ten major Korean banks, including KEXIM.

2.      Moneual orchestrated an elaborate scheme of circular transactions through which it sold fraudulent receivables based on purchase orders issued by foreign importers, such as the defendants, ASI Corporation and its affiliate ASI Computer Technologies, Inc., who participated in the fraud scheme.  Moneual then sold additional receivables to pay for the previously sold receivables, when in fact little to nothing was exported.  Moneual management personnel involved in the fraud – including its Chief Executive Officer, Hong-seok Park, the ringleader and CEO of Moneual – have been imprisoned and fined.

3.      Moneual secured the connivance of its foreign importers in its fraudulent scheme by paying kickbacks to executives and employees of those companies, including executives and employees of the defendants.

4.      Here, KEXIM sues one of the participants in Moneual's fraudulent scheme, a California-based importer of goods from Moneual, against whose invoices from Moneual KEXIM paid Moneual approximately $52 million, of which approximately $40 million has never been repaid.

**THE PARTIES**

5.      KEXIM is a bank incorporated under the laws of the Republic of

1    Korea within the Ministry of Finance of Korea.  KEXIM is an agency or

2    instrumentality of the Republic of Korea as defined by 28 U.S.C. § 1603(b), with its

3    principal place of business in Seoul, Korea.

4         6.     KEXIM is the official export credit agency of the Republic of Korea.

5    It provides comprehensive export loan and guarantee programs to support Korean

6    enterprises conducting business overseas.  Its primary services include export

7    financing, trade financing, and guarantee programs to strengthen its clients'

8    competitiveness in global markets.

9         7.     KEXIM provides numerous types of financing, including export

10   promotion loans, export growth loans, export project loans, export facilitation

11   loans, overseas investment and project loans.  KEXIM structures and funds major

12   infrastructure projects around the world, from Mexico to Morocco to Indonesia,

13   including such projects as the ENEC nuclear power project in Abu Dhabi and the

14   Bosporus tunnel project in Istanbul, Turkey, linking Europe and Asia.  Project

15   Finance International, the leading reporter on the international project finance

16   industry, named KEXIM the 2012 Global Multilateral of the Year.  In 2014 and

17   2015, loans by KEXIM supported total foreign investment of approximately $27

18   billion each year.

19        8.     Defendant ASI Corporation ("**ASI Corp.**") is or was a Delaware

20   corporation.  Defendant ASI Computer Technologies, Inc. ("**ASI Computer**") is a

21   California corporation.  KEXIM is informed and believes and on that basis alleges

22   that ASI Corp. is or was an affiliate of ASI Computer; that ASI Corp. purports to

23   have been merged into ASI Computer; but that at all relevant times, and continuing

24   through the date of filing this Complaint, the defendants continued to use the ASI

25   Corp. name and entity for some purposes.  Each of ASI Corp. and ASI Computer

26   maintains a place of business at its regional office located at 19850 E. Business

27   Parkway in Walnut, California.  In communications with third persons, ASI Corp.

28   and ASI Computer frequently do not distinguish between themselves, and treat their

1  officers, directors, employees, and agents as affiliated interchangeably with either

2  or both entities.  ASI Corp. and ASI Computer share an email domain,

3  @asipartner.com.  Unless otherwise specified, ASI Corp. and ASI Computer are

4  collectively referred to in this Complaint as "**ASI**."  ASI is a wholesale distributor

5  of computer software, hardware, and accessories.

6                    **OTHER PERSONS RELEVANT TO THE COMPLAINT**

7          9.      Moneual Inc. ("**Moneual**") was a prominent Korean manufacturer of

8  computers and home appliances, including robot vacuum cleaners and various types

9  of personal computers.  ASI Corp. purchased, or purported to purchase, products

10  from Moneual for import into the United States, Canada, and Latin America.

11        10.      Hong-seok (Harold) Park ("**HS Park**") was the Chief Executive

12  Officer of Moneual until his arrest and conviction for masterminding the massive

13  fraud that is the subject of this lawsuit.  HS Park is currently serving a 23-year

14  prison sentence in Korea for that conviction.

15        11.      KEXIM is informed and believes and on that basis alleges that at all

16  relevant times **Frances Chou** was a director and agent of ASI Corp. and/or ASI

17  Computer, authorized to enter into contracts and transactions on behalf of ASI

18  Corp. and/or ASI Computer.

19        12.      KEXIM is informed and believes and on that basis alleges that at all

20  relevant times **Bill Chen** was an officer, to wit, Vice President of Finance, of ASI

21  Corp. and/or ASI Computer.

22        13.      KEXIM is informed and believes and on that basis alleges that at all

23  relevant times **Henry Chen** is or was an officer, to wit, Vice President of Business

24  Development and/or Vice President of Sales, of ASI Corp. and/or ASI Computer.

25                         **JURISDICTION AND VENUE**

26        14.      KEXIM invokes this Court's jurisdiction under 28 U.S.C. §

27  1332(a)(4).  Plaintiff is an agency or instrumentality of the Republic of Korea, a

28  foreign state, and defendants are citizens of Delaware and California.  Complete

- 4 -

diversity of citizenship therefore exists between the parties.  The amount in controversy in this action exceeds $75,000 exclusive of interest and costs.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1441(b)(1).  Each defendant is a resident of California and maintains a place of business in Walnut, California, within this District and subject to the personal jurisdiction of this Court.

**FACTUAL ALLEGATIONS**

16.     In or about August 2007, HS Park acquired Dign Lab Co., Ltd. ("**Dign**"), a privately-held company that manufactured and sold robotic vacuum cleaners and other home appliances.  HS Park had been involved in Dign's management since approximately 2005.  After acquiring Dign, HS Park assumed the role of Chief Executive Officer, and on November 27, 2007, he changed the name of the company to Moneual.  Moneual sold TVs, PCs, netbook computers, and robotic vacuum cleaners.

17.     Until its demise, Moneual was publicly perceived in Korea as a successful company on a rapid growth trajectory.  For example, Moneual participated in a highly successful national sales campaign by Lotte Mart, one of Korea's leading retailers, called "Tong Keun" ("magnanimous").  Moneual entered into an agreement to supply Lotte Mart with netbook computers – small, relatively less powerful laptops that are used mainly for web surfing – for Lotte Mart's "Tong Keun Netbook" campaign in 2010.

18.     The "Tong Keun TV" campaign in 2011 proved even more popular.  Moneual's strategy was to incorporate average to high quality LED screens inside basic frames made of plastic.  This made its production costs significantly lower than those of other, better known TV brands that used modern designs and more expensive materials.  People waited in line for hours outside Lotte Mart to purchase the TVs and the promotion generated widespread media attention.

Americas 91116028 (2K)

19.     Moneual also won the Microsoft Innovation Award at the prestigious Consumer Electronics Show in Las Vegas for three consecutive years from 2007 to 2009.  Such achievements, the success of the "Tong Keun" campaigns, and widespread media exposure through prime time TV commercials and the news, quickly earned Moneual major name recognition in Korea.  As a result, third persons believed that Moneual was a legitimate and successful business enterprise.

20.     KEXIM's Small and Medium-Sized Entrepreneur Finance Department ("SME") makes commercial loans to small and medium-sized businesses in accordance with the Korean government's policy to support such enterprises.  Since the 2000s, Moneual was a major customer of KEXIM's SME.

21.     KEXIM's Structured Trade Finance Department ("STF") is responsible for KEXIM's factoring business.  Factoring is a form of lending under which a lender purchases a business's trade receivables at a discount to their face value, advancing money to the business and collecting the receivable from the business's customer at its maturity.  Factoring is a recognized method of enhancing a business's cash flow by enabling the business to receive payment for customer orders immediately or shortly after shipment of goods, before the customer would be required to pay for the goods under its agreed trade terms with the seller.  The customer pays the factor directly when the invoice comes due.  Factoring is widely used by businesses for both domestic and international sales.

22.     In June 2013, Moneual requested that KEXIM factor Moneual's export receivables due from its customer China National Building Materials & Equipment Import & Export Corporation ("**CBMIE**").  CBMIE is a subsidiary of China National Building Materials Group Corporation, a Chinese state-owned enterprise which is the largest comprehensive building materials industry group in China, with 100,000 employees and over $16 billion in total assets.  Moneual claimed that it needed financing because all of its sales were credit transactions and, as a result, it did not have enough liquidity to sustain its rapidly increasing production demands.

23.     KEXIM assessed the business opportunity.  KEXIM reviewed audit reports issued on Moneual, and Jong-Hyun (John) Lee ("**JH Lee**"), KEXIM's Director of STF's International Factoring Team, visited Moneual's headquarters in Seoul in or about August 2013.  During the visit, Moneual's management convinced KEXIM that Moneual had a number of successful products, and was busily developing new and innovative products.  Moneual had prototypes on display and impressive brochures.  Based in part on Moneual's representations during this visit, KEXIM ultimately decided to expand its business with Moneual to include a factoring relationship.

24.     In August 2013, KEXIM and Moneual entered into an Export Factoring Agreement for Moneual's exports to CBMIE, to be renewed annually.

25.     On or about August 19, 2013, KEXIM made its first purchase of Moneual's export receivables due from CBMIE.  KEXIM initially purchased a total amount of receivables of $20 million, payable on February 14, 2014.  KEXIM received timely payment for that initial purchase from Moneual rather than from the customer CBMIE.

26.     The successful consummation of this first factoring transaction gave KEXIM comfort as to Moneual's bona fides and creditworthiness, and induced KEXIM to enter into additional factoring transactions with Moneual as described below, including maintaining and renewing an Export Factoring Agreement for Moneual's exports to ASI.  In reality, the successful initial transaction with CBMIE (and later the successful initial transaction with ASI) was merely a ruse by Moneual to provide KEXIM with the illusion that Moneual operated a genuine export business with legitimate customers and transactions and thereby to induce KEXIM to continue to finance Moneual's receivables transactions.

27.     On or about October 15, 2013, Moneual entered into an "OEM Suppy [sic] Agreement" (the "**Supply Agreement**") with ASI Corp.  Under the Supply Agreement, ASI Corp. was to be the exclusive importer and distributor of Moneual

- 7 -

1   products within the United States, Canada and Latin America.  Payment for orders

2   was due on a net 180 days basis.  The Supply Agreement is governed by California

3   law.

4          28.    In the Supply Agreement, ASI Corp. guaranteed to purchase $200

5   million of Moneual products within the first year and $400 million within the

6   second – in hindsight, a phenomenally large commitment, representing nearly 30%

7   of ASI Corp.'s total revenue, which KEXIM is informed and believes and on that

8   basis alleges would have been impossible, or, at a minimum, onerous, for ASI

9   Corp. to meet.  That was especially true given Moneual's minimal market exposure

10  and limited brand recognition in the North and Central American territories where

11  ASI Corp. was to distribute its products, such that ASI Corp. would have been

12  confronted with great difficulty reselling the Moneual products.

13         29.    The Supply Agreement was executed on behalf of Moneual by HS

14  Park and on behalf of ASI Corp. by Frances Chou as Director of ASI Corp.

15         30.    After entering into the Supply Agreement, Moneual requested KEXIM

16  to factor its export receivables due from ASI Computer.  KEXIM carried out an

17  evaluation of ASI's creditworthiness as part of its due diligence process.  In

18  connection with that evaluation, Moneual's agent Kyeong-Shik Kang sent KEXIM

19  a certification of ASI Computer's business history prepared by the Korea Trade

20  Insurance Corporation ("**KSURE**"), Korea's official export credit agency.  KSURE

21  is a corporation under the Korean Ministry of Trade, Industry and Energy, whose

22  functions include the operation of trade insurance programs relating to the export

23  and import of goods, and the provision of credit-related services including credit

24  research and credit information management for Korean enterprises.

25         31.    The KSURE certification that Moneual delivered to KEXIM in support

26  of ASI's creditworthiness, dated November 20, 2013, purported to contain

27  Moneual's export performance data for each of its customers, including ASI

28  Computer, for the years 2006-2013.  This document showed substantial export

- 8 -

figures and full collection of those amounts, and was therefore material in persuading KEXIM to approve the factoring of Moneual's export receivables due from ASI Computer.  The document also showed a dramatic rise in Moneual's exports to ASI Computer between 2006 and 2012, from less than $1 million in 2006, to approximately $81 million in 2009, and over $180 million in 2012, which amounts were purportedly insured by KSURE and subsequently collected in full.

32.    Those figures later proved to be false.  KEXIM is informed and believes and on that basis alleges that, in fact, those figures were highly inflated, and reflected fictitious and/or fraudulent transactions between Moneual and ASI Computer.  Moneual supplied those figures to KEXIM with the intent to deceive KEXIM into entering into a factoring agreement for Moneual's receivables from ASI Computer and making available to Moneual a credit facility in the tens of millions of dollars.

33.    When KEXIM requested additional documents from Moneual to support ASI's creditworthiness, Moneual requested that KEXIM communicate directly with ASI's Vice President of Finance, Bill Chen, and gave KEXIM his email address.  On November 18, 2013, KEXIM sent an email to Bill Chen and requested ASI Computer's financial statements.  On November 19, 2013, Bill Chen replied from his ASI email account and attached ASI's 2010-2012 balance sheets and income statements to his email, although they were missing the auditor's signature.  On November 22, 2013, following KEXIM's request for the statements with the auditor's signature in place, Bill Chen sent the auditor's cover letter and opinion.

34.    In or about December 2013, in reliance on the information provided by Moneual and by ASI, KEXIM entered into an Export Factoring Agreement with Moneual to factor Moneual's exports to ASI Computer, without recourse against Moneual.  KEXIM and Moneual subsequently entered into new Export Factoring Agreements on or about June 25, 2014,and on or about September 19, 2014, each

on substantially the same terms, and the three Export Factoring Agreements are collectively referred to as the "**EFA**."  Under the EFA, Moneual agreed to sell and KEXIM agreed to purchase Moneual's rights and benefits to receive payments from ASI Computer for the commercial invoices Moneual sent to ASI Computer for its shipments of goods.

35.    Moneual's initial credit limit under the EFA was $12 million.  The June 2014 agreement increased Moneual's credit limit to $29 million and the September 2014 agreement increased Moneual's credit limit to $40 million. KEXIM granted each increase in Moneual's credit limit at Moneual's request, based on Moneual's representations to KEXIM that Moneual had outstanding invoices to ASI Computer in those amounts which it asked KEXIM to factor.

36.    After KEXIM and Moneual entered into the EFA in December 2013, Moneual sent ASI Computer a notification informing ASI Computer that it should make payments on Moneual's invoices directly to KEXIM.  The notification was signed by Moneual's CEO, HS Park, and acknowledged by Frances Chou, as "Director."  Moneual sent an essentially identical notification to ASI Computer in 2014, signed and acknowledged by the same persons.

37.    After Moneual and ASI Corp. entered into their Supply Agreement in October 2013, KEXIM is informed and believes and on that basis alleges that in furtherance of the fraud ASI Computer began placing bogus purchase orders with Moneual for the purported purchase of home theater personal computers ("**HTPCs**") manufactured by Moneual.  In all, KEXIM is informed and believes and on that basis alleges that ASI placed 36 such purchase orders in four sets, as more fully described below.

38.    The First Set of Purchase Orders.  On or about November 21, 2013, ASI Computer issued eight purported purchase orders, numbered 897680-000 OP, 897681-000 OP, 897682-000 OP, 897683-000 OP, 897684-000 OP, 897685-000 OP, 897686-000 OP and 897687-000 OP.  Each purported purchase order was for

1   500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000.  In total,

2   the eight purported purchase orders in this set (the "**First Set of Purchase**

3   **Orders**") amounted to an aggregate order of $11,920,000.

4       39.    On or about December 18, 2013, Moneual purportedly shipped the

5   goods called for in the First Set of Purchase Orders to the location specified by the

6   purchaser.  The buyer and consignee for the goods was specified as ASI Computer

7   in Fremont, California.  Moneual sent an invoice to ASI Computer for $11,920,000.

8       40.    On or about January 7, 2014, pursuant to the EFA, KEXIM purchased

9   Moneual's purported account receivable from ASI Computer for the invoices

10  pertaining to the First Set of Purchase Orders.

11      41.    Payment for the goods represented by the First Set of Purchase Orders

12  was due on June 16, 2014, and on or about that date KEXIM received the sum of

13  $11,919,960 by wire transfer from an account in the name of ASI Computer

14  Technologies (HK) Limited ("**ASI (HK)**").  KEXIM is informed and believes and

15  on that basis alleges that ASI (HK) is an affiliate of ASI.

16      42.    <u>The Second Set of Purchase Orders</u>.  On or about April 21, 2014, ASI

17  Computer issued eight purported purchase orders, numbered 926948-000 OP,

18  926949-000 OP, 926950-000 OP, 926951-000 OP, 926952-000 OP, 926953-000

19  OP, 926954-000 OP and 926955-000 OP.  Each purported purchase order was for

20  500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000.  In total,

21  the eight purported purchase orders in this set (the "**Second Set of Purchase**

22  **Orders**") amounted to an aggregate order of $11,920,000.

23      43.    On or about June 12, 2014, Moneual purportedly shipped the goods

24  called for in the Second Set of Purchase Orders to the location specified by the

25  purchaser.  The buyer and consignee for the goods was specified as ASI Computer

26  in Fremont, California.  Moneual sent an invoice to ASI Computer for $11,920,000.

27      44.    On or about June 19, 2014 (approximately three days after receiving

28  payment for the money it advanced on the First Set of Purchase Orders), pursuant

to the EFA, KEXIM purchased Moneual's purported account receivable from ASI Computer for the invoices pertaining to the Second Set of Purchase Orders.

45.     Payment for the goods represented by the Second Set of Purchase Orders was due on December 9, 2014.  ASI Computer defaulted on that payment and KEXIM has never received payment for the money it advanced on the Second Set of Purchase Orders.

46.     The Third Set of Purchase Orders.  On or about May 8, 2014, ASI Computer issued ten purported purchase orders, numbered 931068-000 OP, 931069-000 OP, 931070-000 OP, 931071-000 OP, 931072-000 OP, 931073-000 OP, 931074-000 OP, 931075-000 OP, 931076-000 OP and 931077-000 OP.  Nine of the ten purported purchase orders were for 500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000; the tenth was for 200 units of HTPCs at $2,980 each, totaling $596,000.  ASI Computer had also issued two additional purported purchase orders on April 21, 2014 (in addition to the eight issued on that day which formed the Second Set of Purchase Orders), numbered 926956-000 OP and 926957-000 OP, each for 500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000.  The goods under those two purported purchase orders were shipped and invoiced together with those under the ten purported purchase orders issued on May 8, 2014.  In total, the twelve purported purchase orders in this set (the "**Third Set of Purchase Orders**") amounted to an aggregate order of $16,986,000.

47.     On or about June 17, 2014, Moneual purportedly shipped the goods called for in the Third Set of Purchase Orders to the location specified by the purchaser.  The buyer for the goods was specified as ASI Computer in Fremont, California, but the consignee was identified as ASI Computer with an address in Hong Kong.  Moneual sent an invoice to ASI Computer for $16,986,000.

48.     On or about June 26, 2014 (a week after purchasing the purported account receivable from ASI Computer for the invoices pertaining to the Second

1   Set of Purchase Orders, and after acceding to Moneual's request to increase

2   Moneual's credit limit to accommodate this new purchase), pursuant to the EFA,

3   KEXIM purchased Moneual's purported account receivable from ASI Computer for

4   the invoices pertaining to the Third Set of Purchase Orders.

5        49.    Payment for the goods represented by the Third Set of Purchase Orders

6   was due on or about December 14, 2014.  ASI Computer defaulted on that payment

7   and KEXIM has never received payment for the money it advanced on the Third

8   Set of Purchase Orders.

9        50.    <u>The Fourth Set of Purchase Orders</u>.  On or about August 20, 2014, ASI

10   Computer issued eight purported purchase orders, numbered 953143-000 OP,

11   953144-000 OP, 953145-000 OP, 953146-000 OP, 956894-000 OP, 956895-000

12   OP, 956896-000 OP and 956897-000 OP.  Seven of the eight purported purchase

13   orders were for 500 units of HTPCs at the price of $2,980 per unit, totaling

14   $1,490,000; the eighth was for 220 units of HTPCs at $2,980 per unit, totaling

15   $655,600.  In total, the eight purported purchase orders in this set (the "**Fourth Set**

16   **of Purchase Orders**") amounted to an aggregate order of $11,085,600.

17        51.    On or about August 22, 2014, Moneual purportedly shipped the goods

18   called for in the Fourth Set of Purchase Orders to the location specified by the

19   purchaser.  The buyer for the goods was specified as ASI Computer in Fremont,

20   California, but the consignee was identified as ASI Computer Technologies (HK)

21   Limited, at the same Hong Kong address as the consignee on the Third Set of

22   Purchase Orders.  Moneual sent an invoice to ASI Computer for $11,085,600.

23        52.    On or about September 24, 2014, pursuant to the EFA, KEXIM

24   purchased Moneual's purported account receivable from ASI Computer for the

25   invoices pertaining to the Fourth Set of Purchase Orders.

26        53.    Payment for the goods represented by the Fourth Set of Purchase

27   Orders was due on February 18, 2015.  ASI Computer defaulted on that payment

28

- 13 -

1  and KEXIM has never received payment for the money it advanced on the Fourth

2  Set of Purchase Orders.

3      54.    Each purported purchase order in the First through Fourth Sets of

4  Purchase Orders was signed by Frances Chou as Director of ASI Computer.  ASI

5  has never contested that it issued any of the 36 purchase orders.

6      55.    The Hong Kong address given for the consignees in the Third and

7  Fourth Sets of Purchase Orders was bogus.  A company unrelated to ASI was

8  located at that address.  At the time that it advanced funds to Moneual on the Third

9  and Fourth Sets of Purchase Orders, KEXIM did not know that neither ASI

10  Computer, nor ASI Corp., nor any affiliate of either defendant maintained a

11  business at that Hong Kong address.

12      56.    The price of the HTPCs that ASI Computer purportedly bought from

13  Moneual was vastly inflated.  Moneual purported to charge ASI $2,980 per unit,

14  and that amount was stated in the invoices on which KEXIM advanced the funds to

15  Moneual.  However, KEXIM is informed and believes and on that basis alleges that

16  in fact the HTPCs were junk:  old, defective items of obsolescent technology worth,

17  according to the Korean authorities, less than $8 per unit – a fraction of a percent of

18  the amount that Moneual billed to ASI Computer and that KEXIM advanced to

19  Moneual.

20      57.     By July 2014, KEXIM had been repaid for its advance against the

21  First Set of Purchase Orders, but the Second and Third Sets of Purchase Orders

22  remained open.  KEXIM had approximately $29 million in outstanding advances to

23  Moneual against its invoices to ASI Computer for those orders.  KEXIM then

24  inquired of ASI Computer via KEXIM's contact at Moneual whether ASI

25  Computer was in fact in a business relationship with Moneual and whether ASI

26  Computer had issued purchase orders for Moneual products.

27      58.    On or about July 13, 2014, Bill Chen, ASI Computer's Vice President

28  of Finance, responded to KEXIM's inquiry.  Bill Chen sent a letter to KEXIM from

1   his ASI email address affirming that Moneual was "one of [ASI Computer's] most

2   significant supplier[s]" and confirming that ASI Computer had a number of

3   pending purchase orders with Moneual.  In that same letter, ASI Computer

4   expressly affirmed the authority of Frances Chou to enter into the transactions with

5   Moneual.  Bill Chen, an officer of ASI Computer, wrote:  "In regards to the

6   business with Moneual Inc., if signed and confirmed by Frances Chou(mail :

7   f████████u@████████.com.hk) who is our director, all necessary documentation

8   and other follow-up actions are totally valid."

9        59.    Bill Chen's July 13, 2014 letter was intended to, and did, perpetuate

10  the false implication, and deceive KEXIM into believing, that ASI and Moneual

11  were engaged in a legitimate business relationship.  In reliance on Bill Chen's

12  representations in his July 13, 2014 letter, KEXIM purchased Moneual's purported

13  account receivable from ASI Computer for the invoices pertaining to the Fourth Set

14  of Purchase Orders.

15       60.    In or about October 2014, Moneual filed for receivership in Korea,

16  owing in excess of $500 million to its lenders, including KEXIM.  Thereafter, on or

17  about October 23, 2014, KEXIM wrote to ASI to remind ASI Computer of its

18  obligation to pay for the receivables that KEXIM had purchased from Moneual.

19  KEXIM's letter listed 28 open invoices, due on various dates from December 9,

20  2014 through February 18, 2015, corresponding to the 28 purported purchase orders

21  in the Second through Fourth Sets of Purchase Orders.  ASI Computer's total

22  outstanding obligation was $39,991,600.  ASI did not respond to KEXIM's letter.

23       61.    Because of ASI's failure to respond to KEXIM's October 23, 2014

24  letter, JH Lee, a KEXIM employee, travelled from Korea to California.  On or

25  about October 27, 2014, he visited ASI's offices in Fremont, California to evaluate

26  the export transactions between Moneual and ASI Computer and to reconfirm the

27  validity of the purported purchase orders.  On that date, JH Lee attempted to reach

28  both Bill Chen and Frances Chou, but was unable to meet or even locate them.

62.     Mr. Lee then met with Henry Chen, ASI's Vice President of Business Development and/or Sales, in ASI's offices in Fremont. In that meeting, on or about October 27, 2014, Henry Chen confirmed that Bill Chen was a Director of ASI and that Frances Chou was ASI's "procurement officer" in Asia. In a later telephone conversation with Mr. Lee on the same day, Henry Chen confirmed that the purported purchase orders signed by Frances Chou had been issued by ASI Computer and were "open," meaning not yet filled. Henry Chen again confirmed, in an email sent to JH Lee on October 29, 2014, that the purported purchase orders were authentic and open.

63.     KEXIM made two further requests to ASI for payment on the receivables, on or about November 25, 2014 and December 12, 2014, again listing the 28 open invoices totaling $39,991,600. On or about December 15, 2014, JH Lee had a telephone conversation with Henry Chen regarding the status of ASI Computer's orders and payment. In that conversation, Henry Chen again confirmed that Frances Chou was ASI Computer's authorized agent with respect to the Moneual transactions, this time characterizing her as ASI Computer's "special contractor."

64.     On or about December 16, 2014, Henry Chen followed up on the telephone conversation and wrote to JH Lee, stating that ASI Computer had not received the goods specified in the purported purchase orders. Henry Chen did not deny the validity of the purported purchase orders.

65.     Henry Chen's December 16, 2014 correspondence to KEXIM claimed (as ASI Computer's justification for refusing to pay the pending invoices) that ASI Computer had never received a shipment of goods under the Second, Third, or Fourth Set of Purchase Orders and that there was not even a delivery schedule set for those purported purchase orders. However, ASI Computer had issued the Fourth Set of Purchase Orders, for over $11 million, in August 2014, after paying in full for the First Set of Purchase Orders and at a time when the Second and Third

1    Sets of Purchase Orders had been outstanding for nearly four months.  No business

2    in ASI Computer's position would have issued new purchase orders for over $11

3    million to a supplier that was months behind in the delivery of previous orders

4    unless it intended to deceive KEXIM into providing financing to Moneual for

5    transactions that did not exist.

6          66.    Either Henry Chen falsely stated to KEXIM that ASI Computer had

7    not received the goods from the Second, Third, and Fourth Set of Purchase Orders,

8    in which case ASI Computer's failure to pay for the invoices pertaining to those

9    orders evidences its participation in the scheme to defraud KEXIM; or the

10   statement was true, in which case ASI Computer's issuance of the Fourth Set of

11   Purchase Orders evidences its participation in the scheme to defraud KEXIM.

12         67.    ASI Computer has never paid any of the invoices pertaining to the

13   Second, Third, or Fourth Sets of Purchase Orders.  KEXIM has not received

14   payment for the purported receivables that it factored for Moneual pertaining to

15   those invoices, in the total principal sum in default of $39,991,600.

16         68.    In late 2014, the Korean Customs Service conducted an investigation

17   of Moneual's activities and prepared an internal investigation report.  On or about

18   January 23, 2015, the Seoul district prosecutor's office indicted HS Park and other

19   Moneual employees.  The indictment charged that those individuals had caused

20   Moneual to execute large-scale fraud schemes using circular transactions.  The

21   indictment further charged that the price of Moneual's HTPCs was greatly

22   exaggerated, at $2,980 per unit when in fact they were only worth, according to the

23   Korean authorities, approximately $8 per unit.  The indictment also detailed how

24   Moneual executives generated false and fraudulent purchase orders, using purchase

25   order numbers provided by Moneual's foreign importers, which Moneual then used

26   to obtain financing from at least ten banks, including KEXIM, in exchange for

27   purported export receivables.

28

- 17 -

69.     Specifically referring to ASI, the Korean authorities' investigation revealed the following:  that Moneual shipped the HTPCs to ASI Computer, which then sold the HTPCs to a company called Polaris Media Research Inc. ("**Polaris**"), a paper company that HS Park established in Hong Kong.  Polaris then sold the HTPCs to PK Paradigms Holdings Ltd. ("**Paradigms**"), another paper company set up by HS Park.  When the payment dates for the export receivables approached, HS Park transferred money to Paradigms disguised as payment for other goods that Moneual was importing into Korea, when in fact Moneual was bringing back the very HTPCs it had exported.  The money was then transferred in reverse to the supposed flow of the HTPCs (*i.e.*,  Moneual → Paradigms → Polaris → ASI), to allow ASI Computer to make payments to financial institutions for the export receivables.  In fact, the HTPCs may not even have physically moved; the transfer of their ownership may only have taken place on paper.  Making these circular payments enabled the participants to continue to deceive the banks, including KEXIM, and to prolong the fraudulent scheme.

70.     KEXIM is informed and believes and on that basis alleges that as part of Moneual's scheme to defraud its lenders by obtaining money from them based on bogus export receivables from foreign importers, Moneual bribed executives and employees of those foreign importers, including ASI, by paying kickbacks to those persons, which HS Park called "commissions."

71.     Specifically with respect to ASI, KEXIM is informed and believes and on that basis alleges that Moneual paid kickbacks, directly (or, through intermediaries or family members or to offshore accounts) to officers and employees of ASI including, among others, Frances Chou, Bill Chen, and Henry Chen.  KEXIM is informed and believes and on that basis alleges that Moneual paid each of those individuals, and each of those individuals accepted, in excess of $1 million in kickbacks between 2012 and 2014.  KEXIM is informed and believes and on that basis alleges that Moneual also paid kickbacks to other senior officers

1    or employees of ASI, or to companies controlled by them including Berwick

2    Resources Ltd.

3        72.    HS Park was convicted in the Seoul Central District Court of

4    defrauding ten Korean banks, including KEXIM, of over $3 billion between 2007

5    and 2014 based on loans that Moneual received for fraudulent export contracts.  On

6    October 16, 2015, HS Park was sentenced to 23 years in prison, and fines and

7    forfeitures of approximately $35 million.  He is currently serving his sentence.

8        73.    KEXIM is informed and believes and on that basis alleges that other

9    employees or executives of Moneual have also been convicted of fraud based on

10   their participation in the fraudulent schemes of Moneual and HS Park to defraud

11   Moneual's lenders.

12                         **<u>FIRST CLAIM FOR RELIEF</u>**

13                              **(Fraud)**

14       74.    KEXIM realleges the allegations of paragraphs 1 through 73 and

15   incorporates those allegations here as if fully set forth.

16       75.    While engaging in and carrying out the course of conduct alleged

17   above, Moneual, ASI Corp., and ASI Computer made numerous misrepresentations

18   of material fact to KEXIM, and/or concealed from or failed to disclose to KEXIM

19   facts that would have been material to KEXIM's decision to engage in its factoring

20   relationship with Moneual, and/or that were necessary to make the statements of

21   Moneual and ASI not misleading.  Those misrepresentations, concealments, and

22   failures to disclose included, among others, the following:

23           a.   The Supply Agreement required ASI Corp. to purchase an

24               unrealistically high quantity of goods from Moneual – $200 million

25               in the first year of the Supply Agreement and $400 million in the

26               second – that was either impossible for ASI Corp. to meet or would

27               have been onerous given the size and condition of ASI Corp.'s

28               business;

- 19 -

COMPLAINT

b.  The HTPCs that ASI Computer was purportedly buying from Moneual were priced at an amount nearly 400 times their actual market value.  No business of the size, breadth, history, and experience of ASI could legitimately have judged that the products were worth the nearly $3,000 per unit that ASI Computer was supposedly paying for them, and no such business would have bought the products at that inflated price, unless it intended to create the illusion of extensive, profitable, high-value commerce between it and its supplier for the purpose of defrauding lenders into supporting the transactions;

c.  Moneual provided KEXIM with the November 20, 2013 KSURE certification document which purported to show a business relationship between Moneual and ASI Computer involving payment in full of tens of millions of dollars per year, figures which were false and known to Moneual to be false when provided to KEXIM;

d.  ASI Computer issued the Second and Third Sets of Purchase Orders in April and May 2014, well after it had received the goods from its First Set of Purchase Orders (in or about December 2013) and at a time when it knew or should have known that the HTPCs were wildly overpriced relative to their actual worth.  ASI Computer would not have issued those purchase orders, in the amount of nearly $30 million, unless it intended to deceive KEXIM into providing financing to Moneual for nonexistent transactions;

e.  In June 2014, ASI sent to KEXIM by wire transfer, from an account of its Hong Kong affiliate, approximately $12 million in payment for the invoices pertaining to the First Set of Purchase Orders.  Due to the nature of Moneual's fraudulent scheme, based

- 20 -

1             on circular transactions, Moneual may never have actually

2             physically shipped the HTPCs to ASI Computer.  ASI made its

3             June 2014 payment for the purpose of creating for KEXIM the

4             illusion that the First Set of Purchase Orders represented a genuine

5             transaction, in order to deceive KEXIM into continuing to finance

6             Moneual's exports to ASI Computer, thereby prolonging the

7             fraudulent scheme;

8        f.  On or about July 13, 2014, Bill Chen, an officer of ASI Computer,

9             stated in writing to KEXIM that Moneual was "one of [ASI's] most

10          significant supplier[s]" and represented that ASI Computer had

11          numerous pending purchase orders with Moneual;

12       g.  In that same letter, Bill Chen, an officer of ASI Computer,

13          expressly confirmed that Frances Chou was a director of ASI

14          Computer, affirmed her authority to enter into the transactions with

15          Moneual represented by the purported purchase orders, and assured

16          KEXIM that documentation and follow-up actions in which she

17          was involved were "totally valid";

18       h.  Henry Chen, an officer of ASI Computer, represented to KEXIM

19          on at least three occasions, in October and in December 2014, that

20          both Bill Chen and Frances Chou were directors, officers, or

21          authorized agents of ASI Computer, and did not disclose any limits

22          on the authority of either one with regard to the Moneual

23          transactions.

24     76.    Moneual, ASI Corp., and ASI Computer made each of the

25  misrepresentations set forth in paragraphs 75(a)-(h) with knowledge of its falsity,

26  and with the intent to deceive KEXIM, by inducing KEXIM to advance millions of

27  dollars to Moneual against fraudulent receivables that ASI Computer had neither

28  the intent, nor the ability, to pay.

                                        COMPLAINT

77.     KEXIM relied on the representations of Moneual, ASI Corp., and ASI Computer set forth above in determining, first, to enter into the EFA with Moneual for the ASI Computer receivables, and, second, to advance a total of approximately $52 million to Moneual against purported receivables which Moneual and ASI Computer knew to be fraudulent.  KEXIM would not have entered into the EFA, or advanced money thereunder to Moneual, if KEXIM had known that the purchase orders that ASI Computer issued for Moneual HTPCs were fraudulent or that Moneual was engaged in a massive scheme to defraud KEXIM and numerous other banks by conspiring with foreign importers such as ASI Computer to create the illusion that Moneual was exporting millions of dollars of goods in legitimate business transactions.

78.     KEXIM justifiably relied on the representations of Moneual, ASI Corp., and ASI Computer, in that KEXIM conducted a commercially reasonable investigation into the business of its customer Moneual and the creditworthiness of Moneual's customer ASI and reasonably determined, based on information which turned out to be false, that Moneual's business was legitimate and would support the factoring agreement for Moneual's receivables.

79.     In addition to defrauding KEXIM directly by making the misrepresentations alleged above, ASI Corp. and ASI Computer rendered substantial assistance to HS Park and Moneual to enable them to carry out the scheme to defraud Moneual's lenders, including KEXIM.  ASI Corp. and ASI Computer rendered such assistance by, among other actions:

   a. entering into the Supply Agreement with Moneual on unmeetable or onerous terms calling for the minimum purchase of hundreds of millions of dollars of Moneual products;

   b. furnishing KEXIM with ASI's financial statements;

   c. issuing purchase orders for nearly 18,000 units of HTPCs at enormously inflated prices relative to their true value, enabling

1   Moneual to use those purported purchase orders to induce KEXIM

2   to enter into the EFA, progressively raise Moneual's credit limit to

3   $40 million, and ultimately advance that sum to Moneual against

4   fraudulent receivables;

5   d.  paying KEXIM in respect of Moneual's purported receivable on the

6   First Set of Purchase Orders, thereby enabling Moneual to construct

7   and prolong its deceptive scheme;

8   e.  suffering or permitting their executives, officers, and employees to

9   receive millions of dollars in bribes in the form of kickbacks from

10  Moneual; and

11  f.  assuring KEXIM on multiple occasions that ASI Computer had a

12  genuine business relationship with Moneual, that the purported

13  purchase orders that ASI Computer issued for Moneual products

14  were authentic and authorized, and that actions taken by Frances

15  Chou were "totally valid," all as set forth more particularly above.

16  80.  KEXIM is informed and believes and on that basis alleges that ASI

17  Corp. and ASI Computer, through their directors, officers, employees, and agents,

18  including without limitation Frances Chou, Bill Chen, and Henry Chen, had actual

19  knowledge of the fraudulent scheme perpetrated against Moneual's lenders,

20  including KEXIM, at the time that ASI Corp. and ASI Computer rendered each act

21  substantially assisting Moneual and its executives, including HS Park, to carry out

22  their fraudulent scheme.  Each of ASI Corp. and ASI Computer therefore aided and

23  abetted Moneual and HS Park in the scheme to defraud KEXIM.

24  81.  KEXIM is informed and believes and on that basis alleges that ASI

25  Corp. and ASI Computer shared with Moneual and its executives, including HS

26  Park, a common plan or design to defraud Moneual's lenders, including KEXIM.

27  In furtherance of that common plan or design, ASI Corp. and ASI Computer

28  conspired with Moneual and HS Park to defraud KEXIM by engaging in the acts

Americas 91116028 (2K)

COMPLAINT

1   and making the representations alleged above.  Each of ASI Corp. and ASI

2   Computer is therefore liable to the same extent as Moneual and HS Park for the

3   damages KEXIM sustained as a result of the scheme to defraud it.

4        82.   As a result of the foregoing misrepresentations, concealments, and

5   nondisclosures made to KEXIM, and KEXIM's reliance thereon, KEXIM has been

6   damaged in a minimum amount of $39,991,600, plus interest according to proof.

7        83.   KEXIM is informed and believes and on that basis alleges that ASI

8   Corp. and ASI Computer, through their officers, directors, or managing agents,

9   each had advance knowledge of the unfitness of its employees and agents, and

10   employed them with an intent to deceive and/or with a conscious disregard of the

11   rights of others, including KEXIM, and that each authorized and ratified the

12   fraudulent conduct of its employees and agents as alleged herein.  KEXIM is

13   therefore entitled to exemplary damages against ASI Corp. and ASI Computer, in

14   an amount sufficient to punish the defendants and deter similar conduct in the

15   future.

16                    **<u>SECOND CLAIM FOR RELIEF</u>**

17                      **(Negligent Misrepresentation)**

18        84.   KEXIM realleges the allegations of paragraphs 1 through 83 and

19   incorporates those allegations here as if fully set forth.

20        85.   The statements and representations of Moneual, ASI Corp., and ASI

21   Computer as set forth above were untrue.  Moneual, ASI Corp., and ASI Computer

22   made those statements and representations with no reasonable ground for believing

23   them to be true, and with the intent to induce KEXIM to rely upon them.  KEXIM

24   was unaware of the falsity of those statements and representations, and justifiably

25   relied on those statements and representations in determining, first, to enter into the

26   EFA with Moneual for the ASI Computer receivables, and, second, to advance a

27   total of approximately $52 million to Moneual against purported receivables which

28   Moneual, ASI Corp., and ASI Computer either knew to be fraudulent or had no

1    reasonable grounds to believe were genuine.

2         86.    As a proximate result of KEXIM's reliance on the truth of the

3    statements and representations of ASI Corp. and ASI Computer, and their other acts

4    and omissions as alleged above, KEXIM has been damaged in a minimum amount

5    of $39,991,600, plus interest according to proof.

6                              **THIRD CLAIM FOR RELIEF**

7                              **(Negligent Supervision)**

8         87.    KEXIM realleges the allegations of paragraphs 1 through 86 and

9    incorporates those allegations here as if fully set forth.

10        88.    KEXIM is informed and believes and on that basis alleges that ASI

11   Corp. and ASI Computer negligently trained, managed, supervised, and retained

12   their officers, employees and agents, including without limitation Frances Chou,

13   Bill Chen, and Henry Chen, as to the performance of their job duties, including the

14   formation of agreements with suppliers, the issuance of purchase orders, and

15   communications with creditors including KEXIM.  KEXIM is informed and

16   believes and on that basis alleges that ASI Corp. and ASI Computer knew or should

17   have known that their officers, employees and agents were or may have been unfit

18   or incompetent to properly carry out their job duties, including those duties

19   specified herein, and failed to adequately supervise their actions.

20        89.    As a result of the negligent supervision by ASI Corp. and ASI

21   Computer of their officers, employees and agents, ASI was enabled to take the

22   actions described above including, among other actions:

23             a.  entering into the Supply Agreement with Moneual on unmeetable

24                 or onerous terms calling for the minimum purchase of hundreds of

25                 millions of dollars of Moneual products;

26             b.  furnishing KEXIM with ASI's financial statements;

27             c.  issuing purchase orders for nearly 18,000 units of HTPCs at

28                 enormously inflated prices relative to their true value, enabling

- 25 -

1      Moneual to use those purported purchase orders to induce KEXIM

2      to enter into the EFA, progressively raise Moneual's credit limit to

3      $40 million, and ultimately advance that sum to Moneual against

4      fraudulent receivables;

5    d. paying KEXIM in respect of Moneual's purported receivable on the

6      First Set of Purchase Orders, thereby enabling Moneual to construct

7      and prolong its deceptive scheme;

8    e. suffering or permitting their executives, officers, and employees to

9      receive millions of dollars in bribes in the form of kickbacks from

10     Moneual; and

11    f. assuring KEXIM on multiple occasions that ASI Computer had a

12     genuine business relationship with Moneual, that the purported

13     purchase orders that ASI Computer issued for Moneual products

14     were authentic and authorized, and that actions taken by Frances

15     Chou were "totally valid," all as set forth more particularly above.

16   90. The negligence of ASI Corp. and ASI Computer, as alleged above,

17 proximately caused damage to KEXIM in a minimum amount of $39,991,600, plus

18 interest according to proof.

19 / / /

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

### **PRAYER FOR RELIEF**

WHEREFORE, KEXIM seeks judgment against ASI Corp. and ASI Computer as follows:

1. For compensatory damages according to proof, in the approximate amount of $40,000,000;

2. For interest thereon at the legal rate;

3. On the First Claim for Relief, for exemplary damages according to proof;

4. For its reasonable attorneys' fees;

5. For its costs of suit; and

6. For such other and further relief as the Court deems fit.

Dated: March 25, 2016                    WHITE & CASE LLP


By:___*/s/ Bryan A. Merryman*___
                Bryan A. Merryman

Attorneys for Plaintiff
THE EXPORT-IMPORT BANK
OF KOREA


### **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38-1, KEXIM demands a trial by jury of all issues so triable.


Dated: March 25, 2016                    WHITE & CASE LLP


By:___*/s/ Bryan A. Merryman*___
                Bryan A. Merryman

Attorneys for Plaintiff
THE EXPORT-IMPORT BANK
OF KOREA

- 27 -

COMPLAINT