# EXHIBIT "A"

BRYAN A. MERRYMAN (SBN: 134357)
bmerryman@whitecase.com
JAMES K. LEE (SBN: 162350)
jklee@whitecase.com
EARLE MILLER (SBN: 116864)
emiller@whitecase.com
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329

Attorneys for Plaintiff
THE EXPORT-IMPORT BANK OF KOREA

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| THE EXPORT-IMPORT BANK OF KOREA, an agency or instrumentality of the Republic of Korea, | Case No. 2:16-cv-2056 |
| | **COMPLAINT FOR:** |
| Plaintiff, | **(1) FRAUD;** |
| v. | **(2) NEGLIGENT MISREPRESENTATION; AND** |
| ASI CORPORATION, a Delaware corporation; ASI COMPUTER TECHNOLOGIES, INC., a California corporation, | **(3) NEGLIGENT SUPERVISION** |
| Defendants. | |

Plaintiff The Export-Import Bank of Korea ("**KEXIM**") complains of defendants and alleges as follows:

1.    In October 2014, a company called Moneual, Inc., a manufacturer of computers and home appliances, shocked the nation of South Korea when it was exposed for perpetrating one of the biggest cases of fraud in Korea's history.  A Korean court described the scandal as a crime that "gravely undermined the trust of the society in general toward the financial system" and "caused a real risk that may put a damper on the trade insurance system and export finance system."  Through fraudulent means, Moneual received loans exceeding $3 billion and victimized ten major Korean banks, including KEXIM.

2.    Moneual orchestrated an elaborate scheme of circular transactions through which it sold fraudulent receivables based on purchase orders issued by foreign importers, such as the defendants, ASI Corporation and its affiliate ASI Computer Technologies, Inc., who participated in the fraud scheme.  Moneual then sold additional receivables to pay for the previously sold receivables, when in fact little to nothing was exported.  Moneual management personnel involved in the fraud – including its Chief Executive Officer, Hong-seok Park, the ringleader and CEO of Moneual – have been imprisoned and fined.

3.    Moneual secured the connivance of its foreign importers in its fraudulent scheme by paying kickbacks to executives and employees of those companies, including executives and employees of the defendants.

4.    Here, KEXIM sues one of the participants in Moneual's fraudulent scheme, a California-based importer of goods from Moneual, against whose invoices from Moneual KEXIM paid Moneual approximately $52 million, of which approximately $40 million has never been repaid.

## THE PARTIES

5.    KEXIM is a bank incorporated under the laws of the Republic of

- 2 -

Korea within the Ministry of Finance of Korea. KEXIM is an agency or instrumentality of the Republic of Korea as defined by 28 U.S.C. § 1603(b), with its principal place of business in Seoul, Korea.

6. KEXIM is the official export credit agency of the Republic of Korea. It provides comprehensive export loan and guarantee programs to support Korean enterprises conducting business overseas. Its primary services include export financing, trade financing, and guarantee programs to strengthen its clients' competitiveness in global markets.

7. KEXIM provides numerous types of financing, including export promotion loans, export growth loans, export project loans, export facilitation loans, overseas investment and project loans. KEXIM structures and funds major infrastructure projects around the world, from Mexico to Morocco to Indonesia, including such projects as the ENEC nuclear power project in Abu Dhabi and the Bosporus tunnel project in Istanbul, Turkey, linking Europe and Asia. Project Finance International, the leading reporter on the international project finance industry, named KEXIM the 2012 Global Multilateral of the Year. In 2014 and 2015, loans by KEXIM supported total foreign investment of approximately $27 billion each year.

8. Defendant ASI Corporation ("**ASI Corp.**") is or was a Delaware corporation. Defendant ASI Computer Technologies, Inc. ("**ASI Computer**") is a California corporation. KEXIM is informed and believes and on that basis alleges that ASI Corp. is or was an affiliate of ASI Computer; that ASI Corp. purports to have been merged into ASI Computer; but that at all relevant times, and continuing through the date of filing this Complaint, the defendants continued to use the ASI Corp. name and entity for some purposes. Each of ASI Corp. and ASI Computer maintains a place of business at its regional office located at 19850 E. Business Parkway in Walnut, California. In communications with third persons, ASI Corp. and ASI Computer frequently do not distinguish between themselves, and treat their

COMPLAINT

officers, directors, employees, and agents as affiliated interchangeably with either or both entities.  ASI Corp. and ASI Computer share an email domain, @asipartner.com.  Unless otherwise specified, ASI Corp. and ASI Computer are collectively referred to in this Complaint as "**ASI**."  ASI is a wholesale distributor of computer software, hardware, and accessories.

## **OTHER PERSONS RELEVANT TO THE COMPLAINT**

9.     Moneual Inc. ("**Moneual**") was a prominent Korean manufacturer of computers and home appliances, including robot vacuum cleaners and various types of personal computers.  ASI Corp. purchased, or purported to purchase, products from Moneual for import into the United States, Canada, and Latin America.

10.     Hong-seok (Harold) Park ("**HS Park**") was the Chief Executive Officer of Moneual until his arrest and conviction for masterminding the massive fraud that is the subject of this lawsuit.  HS Park is currently serving a 23-year prison sentence in Korea for that conviction.

11.     KEXIM is informed and believes and on that basis alleges that at all relevant times **Frances Chou** was a director and agent of ASI Corp. and/or ASI Computer, authorized to enter into contracts and transactions on behalf of ASI Corp. and/or ASI Computer.

12.     KEXIM is informed and believes and on that basis alleges that at all relevant times **Bill Chen** was an officer, to wit, Vice President of Finance, of ASI Corp. and/or ASI Computer.

13.     KEXIM is informed and believes and on that basis alleges that at all relevant times **Henry Chen** is or was an officer, to wit, Vice President of Business Development and/or Vice President of Sales, of ASI Corp. and/or ASI Computer.

## **JURISDICTION AND VENUE**

14.     KEXIM invokes this Court's jurisdiction under 28 U.S.C. § 1332(a)(4).  Plaintiff is an agency or instrumentality of the Republic of Korea, a foreign state, and defendants are citizens of Delaware and California.  Complete

1  diversity of citizenship therefore exists between the parties. The amount in

2  controversy in this action exceeds $75,000 exclusive of interest and costs.

3         15.    Venue is proper in this District pursuant to 28 U.S.C. § 1441(b)(1).

4  Each defendant is a resident of California and maintains a place of business in

5  Walnut, California, within this District and subject to the personal jurisdiction of

6  this Court.

7                           **FACTUAL ALLEGATIONS**

8         16.    In or about August 2007, HS Park acquired Dign Lab Co., Ltd.

9  ("**Dign**"), a privately-held company that manufactured and sold robotic vacuum

10  cleaners and other home appliances. HS Park had been involved in Dign's

11  management since approximately 2005. After acquiring Dign, HS Park assumed

12  the role of Chief Executive Officer, and on November 27, 2007, he changed the

13  name of the company to Moneual. Moneual sold TVs, PCs, netbook computers,

14  and robotic vacuum cleaners.

15         17.    Until its demise, Moneual was publicly perceived in Korea as a

16  successful company on a rapid growth trajectory. For example, Moneual

17  participated in a highly successful national sales campaign by Lotte Mart, one of

18  Korea's leading retailers, called "Tong Keun" ("magnanimous"). Moneual entered

19  into an agreement to supply Lotte Mart with netbook computers – small, relatively

20  less powerful laptops that are used mainly for web surfing – for Lotte Mart's "Tong

21  Keun Netbook" campaign in 2010.

22         18.    The "Tong Keun TV" campaign in 2011 proved even more popular.

23  Moneual's strategy was to incorporate average to high quality LED screens inside

24  basic frames made of plastic. This made its production costs significantly lower

25  than those of other, better known TV brands that used modern designs and more

26  expensive materials. People waited in line for hours outside Lotte Mart to purchase

27  the TVs and the promotion generated widespread media attention.

28

19.     Moneual also won the Microsoft Innovation Award at the prestigious Consumer Electronics Show in Las Vegas for three consecutive years from 2007 to 2009.  Such achievements, the success of the "Tong Keun" campaigns, and widespread media exposure through prime time TV commercials and the news, quickly earned Moneual major name recognition in Korea.  As a result, third persons believed that Moneual was a legitimate and successful business enterprise.

20.     KEXIM's Small and Medium-Sized Entrepreneur Finance Department ("SME") makes commercial loans to small and medium-sized businesses in accordance with the Korean government's policy to support such enterprises.  Since the 2000s, Moneual was a major customer of KEXIM's SME.

21.     KEXIM's Structured Trade Finance Department ("STF") is responsible for KEXIM's factoring business.  Factoring is a form of lending under which a lender purchases a business's trade receivables at a discount to their face value, advancing money to the business and collecting the receivable from the business's customer at its maturity.  Factoring is a recognized method of enhancing a business's cash flow by enabling the business to receive payment for customer orders immediately or shortly after shipment of goods, before the customer would be required to pay for the goods under its agreed trade terms with the seller.  The customer pays the factor directly when the invoice comes due.  Factoring is widely used by businesses for both domestic and international sales.

22.     In June 2013, Moneual requested that KEXIM factor Moneual's export receivables due from its customer China National Building Materials & Equipment Import & Export Corporation ("**CBMIE**").  CBMIE is a subsidiary of China National Building Materials Group Corporation, a Chinese state-owned enterprise which is the largest comprehensive building materials industry group in China, with 100,000 employees and over $16 billion in total assets.  Moneual claimed that it needed financing because all of its sales were credit transactions and, as a result, it did not have enough liquidity to sustain its rapidly increasing production demands.

- 6 -

23.     KEXIM assessed the business opportunity.  KEXIM reviewed audit reports issued on Moneual, and Jong-Hyun (John) Lee ("**JH Lee**"), KEXIM's Director of STF's International Factoring Team, visited Moneual's headquarters in Seoul in or about August 2013.  During the visit, Moneual's management convinced KEXIM that Moneual had a number of successful products, and was busily developing new and innovative products.  Moneual had prototypes on display and impressive brochures.  Based in part on Moneual's representations during this visit, KEXIM ultimately decided to expand its business with Moneual to include a factoring relationship.

24.     In August 2013, KEXIM and Moneual entered into an Export Factoring Agreement for Moneual's exports to CBMIE, to be renewed annually.

25.     On or about August 19, 2013, KEXIM made its first purchase of Moneual's export receivables due from CBMIE.  KEXIM initially purchased a total amount of receivables of $20 million, payable on February 14, 2014.  KEXIM received timely payment for that initial purchase from Moneual rather than from the customer CBMIE.

26.     The successful consummation of this first factoring transaction gave KEXIM comfort as to Moneual's bona fides and creditworthiness, and induced KEXIM to enter into additional factoring transactions with Moneual as described below, including maintaining and renewing an Export Factoring Agreement for Moneual's exports to ASI.  In reality, the successful initial transaction with CBMIE (and later the successful initial transaction with ASI) was merely a ruse by Moneual to provide KEXIM with the illusion that Moneual operated a genuine export business with legitimate customers and transactions and thereby to induce KEXIM to continue to finance Moneual's receivables transactions.

27.     On or about October 15, 2013, Moneual entered into an "OEM Suppy [sic] Agreement" (the "**Supply Agreement**") with ASI Corp.  Under the Supply Agreement, ASI Corp. was to be the exclusive importer and distributor of Moneual

products within the United States, Canada and Latin America.  Payment for orders was due on a net 180 days basis.  The Supply Agreement is governed by California law.

28.   In the Supply Agreement, ASI Corp. guaranteed to purchase $200 million of Moneual products within the first year and $400 million within the second – in hindsight, a phenomenally large commitment, representing nearly 30% of ASI Corp.'s total revenue, which KEXIM is informed and believes and on that basis alleges would have been impossible, or, at a minimum, onerous, for ASI Corp. to meet.  That was especially true given Moneual's minimal market exposure and limited brand recognition in the North and Central American territories where ASI Corp. was to distribute its products, such that ASI Corp. would have been confronted with great difficulty reselling the Moneual products.

29.   The Supply Agreement was executed on behalf of Moneual by HS Park and on behalf of ASI Corp. by Frances Chou as Director of ASI Corp.

30.   After entering into the Supply Agreement, Moneual requested KEXIM to factor its export receivables due from ASI Computer.  KEXIM carried out an evaluation of ASI's creditworthiness as part of its due diligence process.  In connection with that evaluation, Moneual's agent Kyeong-Shik Kang sent KEXIM a certification of ASI Computer's business history prepared by the Korea Trade Insurance Corporation ("**KSURE**"), Korea's official export credit agency.  KSURE is a corporation under the Korean Ministry of Trade, Industry and Energy, whose functions include the operation of trade insurance programs relating to the export and import of goods, and the provision of credit-related services including credit research and credit information management for Korean enterprises.

31.   The KSURE certification that Moneual delivered to KEXIM in support of ASI's creditworthiness, dated November 20, 2013, purported to contain Moneual's export performance data for each of its customers, including ASI Computer, for the years 2006-2013.  This document showed substantial export

Americas 91116028 (2K)

COMPLAINT

figures and full collection of those amounts, and was therefore material in persuading KEXIM to approve the factoring of Moneual's export receivables due from ASI Computer.  The document also showed a dramatic rise in Moneual's exports to ASI Computer between 2006 and 2012, from less than $1 million in 2006, to approximately $81 million in 2009, and over $180 million in 2012, which amounts were purportedly insured by KSURE and subsequently collected in full.

32.     Those figures later proved to be false.  KEXIM is informed and believes and on that basis alleges that, in fact, those figures were highly inflated, and reflected fictitious and/or fraudulent transactions between Moneual and ASI Computer.  Moneual supplied those figures to KEXIM with the intent to deceive KEXIM into entering into a factoring agreement for Moneual's receivables from ASI Computer and making available to Moneual a credit facility in the tens of millions of dollars.

33.     When KEXIM requested additional documents from Moneual to support ASI's creditworthiness, Moneual requested that KEXIM communicate directly with ASI's Vice President of Finance, Bill Chen, and gave KEXIM his email address.  On November 18, 2013, KEXIM sent an email to Bill Chen and requested ASI Computer's financial statements.  On November 19, 2013, Bill Chen replied from his ASI email account and attached ASI's 2010-2012 balance sheets and income statements to his email, although they were missing the auditor's signature.  On November 22, 2013, following KEXIM's request for the statements with the auditor's signature in place, Bill Chen sent the auditor's cover letter and opinion.

34.     In or about December 2013, in reliance on the information provided by Moneual and by ASI, KEXIM entered into an Export Factoring Agreement with Moneual to factor Moneual's exports to ASI Computer, without recourse against Moneual.  KEXIM and Moneual subsequently entered into new Export Factoring Agreements on or about June 25, 2014,and on or about September 19, 2014, each

1  on substantially the same terms, and the three Export Factoring Agreements are
2  collectively referred to as the "**EFA**."  Under the EFA, Moneual agreed to sell and
3  KEXIM agreed to purchase Moneual's rights and benefits to receive payments from
4  ASI Computer for the commercial invoices Moneual sent to ASI Computer for its
5  shipments of goods.

6      35.    Moneual's initial credit limit under the EFA was $12 million.  The
7  June 2014 agreement increased Moneual's credit limit to $29 million and the
8  September 2014 agreement increased Moneual's credit limit to $40 million.
9  KEXIM granted each increase in Moneual's credit limit at Moneual's request,
10 based on Moneual's representations to KEXIM that Moneual had outstanding
11 invoices to ASI Computer in those amounts which it asked KEXIM to factor.

12     36.    After KEXIM and Moneual entered into the EFA in December 2013,
13 Moneual sent ASI Computer a notification informing ASI Computer that it should
14 make payments on Moneual's invoices directly to KEXIM.  The notification was
15 signed by Moneual's CEO, HS Park, and acknowledged by Frances Chou, as
16 "Director."  Moneual sent an essentially identical notification to ASI Computer in
17 2014, signed and acknowledged by the same persons.

18     37.    After Moneual and ASI Corp. entered into their Supply Agreement in
19 October 2013, KEXIM is informed and believes and on that basis alleges that in
20 furtherance of the fraud ASI Computer began placing bogus purchase orders with
21 Moneual for the purported purchase of home theater personal computers
22 ("**HTPCs**") manufactured by Moneual.  In all, KEXIM is informed and believes
23 and on that basis alleges that ASI placed 36 such purchase orders in four sets, as
24 more fully described below.

25     38.    The First Set of Purchase Orders.  On or about November 21, 2013,
26 ASI Computer issued eight purported purchase orders, numbered 897680-000 OP,
27 897681-000 OP, 897682-000 OP, 897683-000 OP, 897684-000 OP, 897685-000
28 OP, 897686-000 OP and 897687-000 OP.  Each purported purchase order was for

Americas 91116028 (2K)

COMPLAINT

500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000.  In total, the eight purported purchase orders in this set (the "**First Set of Purchase Orders**") amounted to an aggregate order of $11,920,000.

39.     On or about December 18, 2013, Moneual purportedly shipped the goods called for in the First Set of Purchase Orders to the location specified by the purchaser.  The buyer and consignee for the goods was specified as ASI Computer in Fremont, California.  Moneual sent an invoice to ASI Computer for $11,920,000.

40.     On or about January 7, 2014, pursuant to the EFA, KEXIM purchased Moneual's purported account receivable from ASI Computer for the invoices pertaining to the First Set of Purchase Orders.

41.     Payment for the goods represented by the First Set of Purchase Orders was due on June 16, 2014, and on or about that date KEXIM received the sum of $11,919,960 by wire transfer from an account in the name of ASI Computer Technologies (HK) Limited ("**ASI (HK)**").  KEXIM is informed and believes and on that basis alleges that ASI (HK) is an affiliate of ASI.

42.     The Second Set of Purchase Orders.  On or about April 21, 2014, ASI Computer issued eight purported purchase orders, numbered 926948-000 OP, 926949-000 OP, 926950-000 OP, 926951-000 OP, 926952-000 OP, 926953-000 OP, 926954-000 OP and 926955-000 OP.  Each purported purchase order was for 500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000.  In total, the eight purported purchase orders in this set (the "**Second Set of Purchase Orders**") amounted to an aggregate order of $11,920,000.

43.     On or about June 12, 2014, Moneual purportedly shipped the goods called for in the Second Set of Purchase Orders to the location specified by the purchaser.  The buyer and consignee for the goods was specified as ASI Computer in Fremont, California.  Moneual sent an invoice to ASI Computer for $11,920,000.

44.     On or about June 19, 2014 (approximately three days after receiving payment for the money it advanced on the First Set of Purchase Orders), pursuant

to the EFA, KEXIM purchased Moneual's purported account receivable from ASI Computer for the invoices pertaining to the Second Set of Purchase Orders.

45.    Payment for the goods represented by the Second Set of Purchase Orders was due on December 9, 2014.  ASI Computer defaulted on that payment and KEXIM has never received payment for the money it advanced on the Second Set of Purchase Orders.

46.    <u>The Third Set of Purchase Orders</u>.  On or about May 8, 2014, ASI Computer issued ten purported purchase orders, numbered 931068-000 OP, 931069-000 OP, 931070-000 OP, 931071-000 OP, 931072-000 OP, 931073-000 OP, 931074-000 OP, 931075-000 OP, 931076-000 OP and 931077-000 OP.  Nine of the ten purported purchase orders were for 500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000; the tenth was for 200 units of HTPCs at $2,980 each, totaling $596,000.  ASI Computer had also issued two additional purported purchase orders on April 21, 2014 (in addition to the eight issued on that day which formed the Second Set of Purchase Orders), numbered 926956-000 OP and 926957-000 OP, each for 500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000.  The goods under those two purported purchase orders were shipped and invoiced together with those under the ten purported purchase orders issued on May 8, 2014.  In total, the twelve purported purchase orders in this set (the "**Third Set of Purchase Orders**") amounted to an aggregate order of $16,986,000.

47.    On or about June 17, 2014, Moneual purportedly shipped the goods called for in the Third Set of Purchase Orders to the location specified by the purchaser.  The buyer for the goods was specified as ASI Computer in Fremont, California, but the consignee was identified as ASI Computer with an address in Hong Kong.  Moneual sent an invoice to ASI Computer for $16,986,000.

48.    On or about June 26, 2014 (a week after purchasing the purported account receivable from ASI Computer for the invoices pertaining to the Second

1 Set of Purchase Orders, and after acceding to Moneual's request to increase

2 Moneual's credit limit to accommodate this new purchase), pursuant to the EFA,

3 KEXIM purchased Moneual's purported account receivable from ASI Computer for

4 the invoices pertaining to the Third Set of Purchase Orders.

5      49.    Payment for the goods represented by the Third Set of Purchase Orders

6 was due on or about December 14, 2014.  ASI Computer defaulted on that payment

7 and KEXIM has never received payment for the money it advanced on the Third

8 Set of Purchase Orders.

9      50.    <u>The Fourth Set of Purchase Orders</u>.  On or about August 20, 2014, ASI

10 Computer issued eight purported purchase orders, numbered 953143-000 OP,

11 953144-000 OP, 953145-000 OP, 953146-000 OP, 956894-000 OP, 956895-000

12 OP, 956896-000 OP and 956897-000 OP.  Seven of the eight purported purchase

13 orders were for 500 units of HTPCs at the price of $2,980 per unit, totaling

14 $1,490,000; the eighth was for 220 units of HTPCs at $2,980 per unit, totaling

15 $655,600.  In total, the eight purported purchase orders in this set (the "**Fourth Set**

16 **of Purchase Orders**") amounted to an aggregate order of $11,085,600.

17      51.    On or about August 22, 2014, Moneual purportedly shipped the goods

18 called for in the Fourth Set of Purchase Orders to the location specified by the

19 purchaser.  The buyer for the goods was specified as ASI Computer in Fremont,

20 California, but the consignee was identified as ASI Computer Technologies (HK)

21 Limited, at the same Hong Kong address as the consignee on the Third Set of

22 Purchase Orders.  Moneual sent an invoice to ASI Computer for $11,085,600.

23      52.    On or about September 24, 2014, pursuant to the EFA, KEXIM

24 purchased Moneual's purported account receivable from ASI Computer for the

25 invoices pertaining to the Fourth Set of Purchase Orders.

26      53.    Payment for the goods represented by the Fourth Set of Purchase

27 Orders was due on February 18, 2015.  ASI Computer defaulted on that payment

28

- 13 -

COMPLAINT

1   and KEXIM has never received payment for the money it advanced on the Fourth

2   Set of Purchase Orders.

3        54.    Each purported purchase order in the First through Fourth Sets of

4   Purchase Orders was signed by Frances Chou as Director of ASI Computer. ASI

5   has never contested that it issued any of the 36 purchase orders.

6        55.    The Hong Kong address given for the consignees in the Third and

7   Fourth Sets of Purchase Orders was bogus. A company unrelated to ASI was

8   located at that address. At the time that it advanced funds to Moneual on the Third

9   and Fourth Sets of Purchase Orders, KEXIM did not know that neither ASI

10  Computer, nor ASI Corp., nor any affiliate of either defendant maintained a

11  business at that Hong Kong address.

12       56.    The price of the HTPCs that ASI Computer purportedly bought from

13  Moneual was vastly inflated. Moneual purported to charge ASI $2,980 per unit,

14  and that amount was stated in the invoices on which KEXIM advanced the funds to

15  Moneual. However, KEXIM is informed and believes and on that basis alleges that

16  in fact the HTPCs were junk: old, defective items of obsolescent technology worth,

17  according to the Korean authorities, less than $8 per unit – a fraction of a percent of

18  the amount that Moneual billed to ASI Computer and that KEXIM advanced to

19  Moneual.

20       57.    By July 2014, KEXIM had been repaid for its advance against the

21  First Set of Purchase Orders, but the Second and Third Sets of Purchase Orders

22  remained open. KEXIM had approximately $29 million in outstanding advances to

23  Moneual against its invoices to ASI Computer for those orders. KEXIM then

24  inquired of ASI Computer via KEXIM's contact at Moneual whether ASI

25  Computer was in fact in a business relationship with Moneual and whether ASI

26  Computer had issued purchase orders for Moneual products.

27       58.    On or about July 13, 2014, Bill Chen, ASI Computer's Vice President

28  of Finance, responded to KEXIM's inquiry. Bill Chen sent a letter to KEXIM from

1  his ASI email address affirming that Moneual was "one of [ASI Computer's] most
2  significant supplier[s]" and confirming that ASI Computer had a number of
3  pending purchase orders with Moneual.  In that same letter, ASI Computer
4  expressly affirmed the authority of Frances Chou to enter into the transactions with
5  Moneual.  Bill Chen, an officer of ASI Computer, wrote:  "In regards to the
6  business with Moneual Inc., if signed and confirmed by Frances Chou(mail :
7  f██████u@██████.com.hk) who is our director, all necessary documentation
8  and other follow-up actions are totally valid."

9       59.    Bill Chen's July 13, 2014 letter was intended to, and did, perpetuate
10 the false implication, and deceive KEXIM into believing, that ASI and Moneual
11 were engaged in a legitimate business relationship.  In reliance on Bill Chen's
12 representations in his July 13, 2014 letter, KEXIM purchased Moneual's purported
13 account receivable from ASI Computer for the invoices pertaining to the Fourth Set
14 of Purchase Orders.

15      60.    In or about October 2014, Moneual filed for receivership in Korea,
16 owing in excess of $500 million to its lenders, including KEXIM.  Thereafter, on or
17 about October 23, 2014, KEXIM wrote to ASI to remind ASI Computer of its
18 obligation to pay for the receivables that KEXIM had purchased from Moneual.
19 KEXIM's letter listed 28 open invoices, due on various dates from December 9,
20 2014 through February 18, 2015, corresponding to the 28 purported purchase orders
21 in the Second through Fourth Sets of Purchase Orders.  ASI Computer's total
22 outstanding obligation was $39,991,600.  ASI did not respond to KEXIM's letter.

23      61.    Because of ASI's failure to respond to KEXIM's October 23, 2014
24 letter, JH Lee, a KEXIM employee, travelled from Korea to California.  On or
25 about October 27, 2014, he visited ASI's offices in Fremont, California to evaluate
26 the export transactions between Moneual and ASI Computer and to reconfirm the
27 validity of the purported purchase orders.  On that date, JH Lee attempted to reach
28 both Bill Chen and Frances Chou, but was unable to meet or even locate them.

COMPLAINT

62.     Mr. Lee then met with Henry Chen, ASI's Vice President of Business Development and/or Sales, in ASI's offices in Fremont.  In that meeting, on or about October 27, 2014, Henry Chen confirmed that Bill Chen was a Director of ASI and that Frances Chou was ASI's "procurement officer" in Asia.  In a later telephone conversation with Mr. Lee on the same day, Henry Chen confirmed that the purported purchase orders signed by Frances Chou had been issued by ASI Computer and were "open," meaning not yet filled.  Henry Chen again confirmed, in an email sent to JH Lee on October 29, 2014, that the purported purchase orders were authentic and open.

63.     KEXIM made two further requests to ASI for payment on the receivables, on or about November 25, 2014 and December 12, 2014, again listing the 28 open invoices totaling $39,991,600.  On or about December 15, 2014, JH Lee had a telephone conversation with Henry Chen regarding the status of ASI Computer's orders and payment.  In that conversation, Henry Chen again confirmed that Frances Chou was ASI Computer's authorized agent with respect to the Moneual transactions, this time characterizing her as ASI Computer's "special contractor."

64.     On or about December 16, 2014, Henry Chen followed up on the telephone conversation and wrote to JH Lee, stating that ASI Computer had not received the goods specified in the purported purchase orders.  Henry Chen did not deny the validity of the purported purchase orders.

65.     Henry Chen's December 16, 2014 correspondence to KEXIM claimed (as ASI Computer's justification for refusing to pay the pending invoices) that ASI Computer had never received a shipment of goods under the Second, Third, or Fourth Set of Purchase Orders and that there was not even a delivery schedule set for those purported purchase orders.  However, ASI Computer had issued the Fourth Set of Purchase Orders, for over $11 million, in August 2014, after paying in full for the First Set of Purchase Orders and at a time when the Second and Third

Sets of Purchase Orders had been outstanding for nearly four months.  No business in ASI Computer's position would have issued new purchase orders for over $11 million to a supplier that was months behind in the delivery of previous orders unless it intended to deceive KEXIM into providing financing to Moneual for transactions that did not exist.

66.     Either Henry Chen falsely stated to KEXIM that ASI Computer had not received the goods from the Second, Third, and Fourth Set of Purchase Orders, in which case ASI Computer's failure to pay for the invoices pertaining to those orders evidences its participation in the scheme to defraud KEXIM; or the statement was true, in which case ASI Computer's issuance of the Fourth Set of Purchase Orders evidences its participation in the scheme to defraud KEXIM.

67.     ASI Computer has never paid any of the invoices pertaining to the Second, Third, or Fourth Sets of Purchase Orders.  KEXIM has not received payment for the purported receivables that it factored for Moneual pertaining to those invoices, in the total principal sum in default of $39,991,600.

68.     In late 2014, the Korean Customs Service conducted an investigation of Moneual's activities and prepared an internal investigation report.  On or about January 23, 2015, the Seoul district prosecutor's office indicted HS Park and other Moneual employees.  The indictment charged that those individuals had caused Moneual to execute large-scale fraud schemes using circular transactions.  The indictment further charged that the price of Moneual's HTPCs was greatly exaggerated, at $2,980 per unit when in fact they were only worth, according to the Korean authorities, approximately $8 per unit.  The indictment also detailed how Moneual executives generated false and fraudulent purchase orders, using purchase order numbers provided by Moneual's foreign importers, which Moneual then used to obtain financing from at least ten banks, including KEXIM, in exchange for purported export receivables.

69.     Specifically referring to ASI, the Korean authorities' investigation revealed the following:  that Moneual shipped the HTPCs to ASI Computer, which then sold the HTPCs to a company called Polaris Media Research Inc. ("**Polaris**"), a paper company that HS Park established in Hong Kong.  Polaris then sold the HTPCs to PK Paradigms Holdings Ltd. ("**Paradigms**"), another paper company set up by HS Park.  When the payment dates for the export receivables approached, HS Park transferred money to Paradigms disguised as payment for other goods that Moneual was importing into Korea, when in fact Moneual was bringing back the very HTPCs it had exported.  The money was then transferred in reverse to the supposed flow of the HTPCs (*i.e.*,  Moneual → Paradigms → Polaris → ASI), to allow ASI Computer to make payments to financial institutions for the export receivables.  In fact, the HTPCs may not even have physically moved; the transfer of their ownership may only have taken place on paper.  Making these circular payments enabled the participants to continue to deceive the banks, including KEXIM, and to prolong the fraudulent scheme.

70.     KEXIM is informed and believes and on that basis alleges that as part of Moneual's scheme to defraud its lenders by obtaining money from them based on bogus export receivables from foreign importers, Moneual bribed executives and employees of those foreign importers, including ASI, by paying kickbacks to those persons, which HS Park called "commissions."

71.     Specifically with respect to ASI, KEXIM is informed and believes and on that basis alleges that Moneual paid kickbacks, directly (or, through intermediaries or family members or to offshore accounts) to officers and employees of ASI including, among others, Frances Chou, Bill Chen, and Henry Chen.  KEXIM is informed and believes and on that basis alleges that Moneual paid each of those individuals, and each of those individuals accepted, in excess of $1 million in kickbacks between 2012 and 2014.  KEXIM is informed and believes and on that basis alleges that Moneual also paid kickbacks to other senior officers

1   or employees of ASI, or to companies controlled by them including Berwick
2   Resources Ltd.

3        72.    HS Park was convicted in the Seoul Central District Court of
4   defrauding ten Korean banks, including KEXIM, of over $3 billion between 2007
5   and 2014 based on loans that Moneual received for fraudulent export contracts.  On
6   October 16, 2015, HS Park was sentenced to 23 years in prison, and fines and
7   forfeitures of approximately $35 million.  He is currently serving his sentence.

8        73.    KEXIM is informed and believes and on that basis alleges that other
9   employees or executives of Moneual have also been convicted of fraud based on
10  their participation in the fraudulent schemes of Moneual and HS Park to defraud
11  Moneual's lenders.

12  **FIRST CLAIM FOR RELIEF**

13  **(Fraud)**

14       74.    KEXIM realleges the allegations of paragraphs 1 through 73 and
15  incorporates those allegations here as if fully set forth.

16       75.    While engaging in and carrying out the course of conduct alleged
17  above, Moneual, ASI Corp., and ASI Computer made numerous misrepresentations
18  of material fact to KEXIM, and/or concealed from or failed to disclose to KEXIM
19  facts that would have been material to KEXIM's decision to engage in its factoring
20  relationship with Moneual, and/or that were necessary to make the statements of
21  Moneual and ASI not misleading.  Those misrepresentations, concealments, and
22  failures to disclose included, among others, the following:

23       a.  The Supply Agreement required ASI Corp. to purchase an
24         unrealistically high quantity of goods from Moneual – $200 million
25         in the first year of the Supply Agreement and $400 million in the
26         second – that was either impossible for ASI Corp. to meet or would
27         have been onerous given the size and condition of ASI Corp.'s
28         business;

- 19 -

b.  The HTPCs that ASI Computer was purportedly buying from Moneual were priced at an amount nearly 400 times their actual market value.  No business of the size, breadth, history, and experience of ASI could legitimately have judged that the products were worth the nearly $3,000 per unit that ASI Computer was supposedly paying for them, and no such business would have bought the products at that inflated price, unless it intended to create the illusion of extensive, profitable, high-value commerce between it and its supplier for the purpose of defrauding lenders into supporting the transactions;

c.  Moneual provided KEXIM with the November 20, 2013 KSURE certification document which purported to show a business relationship between Moneual and ASI Computer involving payment in full of tens of millions of dollars per year, figures which were false and known to Moneual to be false when provided to KEXIM;

d.  ASI Computer issued the Second and Third Sets of Purchase Orders in April and May 2014, well after it had received the goods from its First Set of Purchase Orders (in or about December 2013) and at a time when it knew or should have known that the HTPCs were wildly overpriced relative to their actual worth.  ASI Computer would not have issued those purchase orders, in the amount of nearly $30 million, unless it intended to deceive KEXIM into providing financing to Moneual for nonexistent transactions;

e.  In June 2014, ASI sent to KEXIM by wire transfer, from an account of its Hong Kong affiliate, approximately $12 million in payment for the invoices pertaining to the First Set of Purchase Orders.  Due to the nature of Moneual's fraudulent scheme, based

1   on circular transactions, Moneual may never have actually

2   physically shipped the HTPCs to ASI Computer.  ASI made its

3   June 2014 payment for the purpose of creating for KEXIM the

4   illusion that the First Set of Purchase Orders represented a genuine

5   transaction, in order to deceive KEXIM into continuing to finance

6   Moneual's exports to ASI Computer, thereby prolonging the

7   fraudulent scheme;

8   f.  On or about July 13, 2014, Bill Chen, an officer of ASI Computer,

9   stated in writing to KEXIM that Moneual was "one of [ASI's] most

10   significant supplier[s]" and represented that ASI Computer had

11   numerous pending purchase orders with Moneual;

12   g.  In that same letter, Bill Chen, an officer of ASI Computer,

13   expressly confirmed that Frances Chou was a director of ASI

14   Computer, affirmed her authority to enter into the transactions with

15   Moneual represented by the purported purchase orders, and assured

16   KEXIM that documentation and follow-up actions in which she

17   was involved were "totally valid";

18   h.  Henry Chen, an officer of ASI Computer, represented to KEXIM

19   on at least three occasions, in October and in December 2014, that

20   both Bill Chen and Frances Chou were directors, officers, or

21   authorized agents of ASI Computer, and did not disclose any limits

22   on the authority of either one with regard to the Moneual

23   transactions.

24   76.   Moneual, ASI Corp., and ASI Computer made each of the

25   misrepresentations set forth in paragraphs 75(a)-(h) with knowledge of its falsity,

26   and with the intent to deceive KEXIM, by inducing KEXIM to advance millions of

27   dollars to Moneual against fraudulent receivables that ASI Computer had neither

28   the intent, nor the ability, to pay.

Americas 91116028 (2K)

COMPLAINT

77.     KEXIM relied on the representations of Moneual, ASI Corp., and ASI Computer set forth above in determining, first, to enter into the EFA with Moneual for the ASI Computer receivables, and, second, to advance a total of approximately $52 million to Moneual against purported receivables which Moneual and ASI Computer knew to be fraudulent.  KEXIM would not have entered into the EFA, or advanced money thereunder to Moneual, if KEXIM had known that the purchase orders that ASI Computer issued for Moneual HTPCs were fraudulent or that Moneual was engaged in a massive scheme to defraud KEXIM and numerous other banks by conspiring with foreign importers such as ASI Computer to create the illusion that Moneual was exporting millions of dollars of goods in legitimate business transactions.

78.     KEXIM justifiably relied on the representations of Moneual, ASI Corp., and ASI Computer, in that KEXIM conducted a commercially reasonable investigation into the business of its customer Moneual and the creditworthiness of Moneual's customer ASI and reasonably determined, based on information which turned out to be false, that Moneual's business was legitimate and would support the factoring agreement for Moneual's receivables.

79.     In addition to defrauding KEXIM directly by making the misrepresentations alleged above, ASI Corp. and ASI Computer rendered substantial assistance to HS Park and Moneual to enable them to carry out the scheme to defraud Moneual's lenders, including KEXIM.  ASI Corp. and ASI Computer rendered such assistance by, among other actions:

       a.  entering into the Supply Agreement with Moneual on unmeetable or onerous terms calling for the minimum purchase of hundreds of millions of dollars of Moneual products;

       b.  furnishing KEXIM with ASI's financial statements;

       c.  issuing purchase orders for nearly 18,000 units of HTPCs at enormously inflated prices relative to their true value, enabling

- 22 -

1          Moneual to use those purported purchase orders to induce KEXIM

2          to enter into the EFA, progressively raise Moneual's credit limit to

3          $40 million, and ultimately advance that sum to Moneual against

4          fraudulent receivables;

5     d.   paying KEXIM in respect of Moneual's purported receivable on the

6          First Set of Purchase Orders, thereby enabling Moneual to construct

7          and prolong its deceptive scheme;

8     e.   suffering or permitting their executives, officers, and employees to

9          receive millions of dollars in bribes in the form of kickbacks from

10         Moneual; and

11     f.   assuring KEXIM on multiple occasions that ASI Computer had a

12         genuine business relationship with Moneual, that the purported

13         purchase orders that ASI Computer issued for Moneual products

14         were authentic and authorized, and that actions taken by Frances

15         Chou were "totally valid," all as set forth more particularly above.

16     80.    KEXIM is informed and believes and on that basis alleges that ASI

17 Corp. and ASI Computer, through their directors, officers, employees, and agents,

18 including without limitation Frances Chou, Bill Chen, and Henry Chen, had actual

19 knowledge of the fraudulent scheme perpetrated against Moneual's lenders,

20 including KEXIM, at the time that ASI Corp. and ASI Computer rendered each act

21 substantially assisting Moneual and its executives, including HS Park, to carry out

22 their fraudulent scheme.  Each of ASI Corp. and ASI Computer therefore aided and

23 abetted Moneual and HS Park in the scheme to defraud KEXIM.

24     81.    KEXIM is informed and believes and on that basis alleges that ASI

25 Corp. and ASI Computer shared with Moneual and its executives, including HS

26 Park, a common plan or design to defraud Moneual's lenders, including KEXIM.

27 In furtherance of that common plan or design, ASI Corp. and ASI Computer

28 conspired with Moneual and HS Park to defraud KEXIM by engaging in the acts

COMPLAINT

1    and making the representations alleged above.  Each of ASI Corp. and ASI

2    Computer is therefore liable to the same extent as Moneual and HS Park for the

3    damages KEXIM sustained as a result of the scheme to defraud it.

4         82.    As a result of the foregoing misrepresentations, concealments, and

5    nondisclosures made to KEXIM, and KEXIM's reliance thereon, KEXIM has been

6    damaged in a minimum amount of $39,991,600, plus interest according to proof.

7         83.    KEXIM is informed and believes and on that basis alleges that ASI

8    Corp. and ASI Computer, through their officers, directors, or managing agents,

9    each had advance knowledge of the unfitness of its employees and agents, and

10   employed them with an intent to deceive and/or with a conscious disregard of the

11   rights of others, including KEXIM, and that each authorized and ratified the

12   fraudulent conduct of its employees and agents as alleged herein.  KEXIM is

13   therefore entitled to exemplary damages against ASI Corp. and ASI Computer, in

14   an amount sufficient to punish the defendants and deter similar conduct in the

15   future.

16                        **SECOND CLAIM FOR RELIEF**

17                        **(Negligent Misrepresentation)**

18        84.    KEXIM realleges the allegations of paragraphs 1 through 83 and

19   incorporates those allegations here as if fully set forth.

20        85.    The statements and representations of Moneual, ASI Corp., and ASI

21   Computer as set forth above were untrue.  Moneual, ASI Corp., and ASI Computer

22   made those statements and representations with no reasonable ground for believing

23   them to be true, and with the intent to induce KEXIM to rely upon them.  KEXIM

24   was unaware of the falsity of those statements and representations, and justifiably

25   relied on those statements and representations in determining, first, to enter into the

26   EFA with Moneual for the ASI Computer receivables, and, second, to advance a

27   total of approximately $52 million to Moneual against purported receivables which

28   Moneual, ASI Corp., and ASI Computer either knew to be fraudulent or had no

1    reasonable grounds to believe were genuine.

2        86.    As a proximate result of KEXIM's reliance on the truth of the

3    statements and representations of ASI Corp. and ASI Computer, and their other acts

4    and omissions as alleged above, KEXIM has been damaged in a minimum amount

5    of $39,991,600, plus interest according to proof.

6                    **THIRD CLAIM FOR RELIEF**

7                        **(Negligent Supervision)**

8        87.    KEXIM realleges the allegations of paragraphs 1 through 86 and

9    incorporates those allegations here as if fully set forth.

10       88.    KEXIM is informed and believes and on that basis alleges that ASI

11   Corp. and ASI Computer negligently trained, managed, supervised, and retained

12   their officers, employees and agents, including without limitation Frances Chou,

13   Bill Chen, and Henry Chen, as to the performance of their job duties, including the

14   formation of agreements with suppliers, the issuance of purchase orders, and

15   communications with creditors including KEXIM.  KEXIM is informed and

16   believes and on that basis alleges that ASI Corp. and ASI Computer knew or should

17   have known that their officers, employees and agents were or may have been unfit

18   or incompetent to properly carry out their job duties, including those duties

19   specified herein, and failed to adequately supervise their actions.

20       89.    As a result of the negligent supervision by ASI Corp. and ASI

21   Computer of their officers, employees and agents, ASI was enabled to take the

22   actions described above including, among other actions:

23           a.  entering into the Supply Agreement with Moneual on unmeetable

24               or onerous terms calling for the minimum purchase of hundreds of

25               millions of dollars of Moneual products;

26           b.  furnishing KEXIM with ASI's financial statements;

27           c.  issuing purchase orders for nearly 18,000 units of HTPCs at

28               enormously inflated prices relative to their true value, enabling

- 25 -

| | |
|---|---|
| 1 | Moneual to use those purported purchase orders to induce KEXIM |
| 2 | to enter into the EFA, progressively raise Moneual's credit limit to |
| 3 | $40 million, and ultimately advance that sum to Moneual against |
| 4 | fraudulent receivables; |
| 5 | d. paying KEXIM in respect of Moneual's purported receivable on the |
| 6 | First Set of Purchase Orders, thereby enabling Moneual to construct |
| 7 | and prolong its deceptive scheme; |
| 8 | e. suffering or permitting their executives, officers, and employees to |
| 9 | receive millions of dollars in bribes in the form of kickbacks from |
| 10 | Moneual; and |
| 11 | f. assuring KEXIM on multiple occasions that ASI Computer had a |
| 12 | genuine business relationship with Moneual, that the purported |
| 13 | purchase orders that ASI Computer issued for Moneual products |
| 14 | were authentic and authorized, and that actions taken by Frances |
| 15 | Chou were "totally valid," all as set forth more particularly above. |
| 16 | 90.  The negligence of ASI Corp. and ASI Computer, as alleged above, |
| 17 | proximately caused damage to KEXIM in a minimum amount of $39,991,600, plus |
| 18 | interest according to proof. |
| 19 | / / / |
| 20 | / / / |
| 21 | / / / |
| 22 | / / / |
| 23 | / / / |
| 24 | / / / |
| 25 | / / / |
| 26 | / / / |
| 27 | / / / |
| 28 | / / / |

- 26 -

## **PRAYER FOR RELIEF**

WHEREFORE, KEXIM seeks judgment against ASI Corp. and ASI Computer as follows:

1.  For compensatory damages according to proof, in the approximate amount of $40,000,000;

2.  For interest thereon at the legal rate;

3.  On the First Claim for Relief, for exemplary damages according to proof;

4.  For its reasonable attorneys' fees;

5.  For its costs of suit; and

6.  For such other and further relief as the Court deems fit.

Dated: March 25, 2016                    WHITE & CASE LLP


By:  */s/ Bryan A. Merryman*
                                 Bryan A. Merryman

Attorneys for Plaintiff
THE EXPORT-IMPORT BANK
OF KOREA


## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38-1, KEXIM demands a trial by jury of all issues so triable.


Dated: March 25, 2016                    WHITE & CASE LLP


By:  */s/ Bryan A. Merryman*
                                 Bryan A. Merryman

Attorneys for Plaintiff
THE EXPORT-IMPORT BANK
OF KOREA

- 27 -

# EXHIBIT "B"

1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   The Export-Import Bank of Korea,        )   CASE NO.  **CV 16-2056-MWF(JPRx)**

12                    Plaintiff(s),           )   **ORDER RE JURY TRIAL**

13        v.                                  )   **I.      ORDER RE DEADLINES**

14   ASI Corporation, et al.,                 )   **II.     ORDER RE TRIAL**
                                              )   **        PREPARATION**
15                    Defendant(s).           )
                                              )   **III.    ORDER GOVERNING**
16                                            )   **        CONDUCT OF ATTORNEYS**
                                              )   **        AND PARTIES**
17                                            )
                                              )   **Trial: April 24, 2018**
18   _____         )   **Time: 8:30 a.m.**

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1

# I.

## DEADLINES

| | |
|---|---|
| Last Day to Add Parties/Amend Pleadings | May 15, 2017 |
| Non-expert Discovery Cut-off | January 29, 2018 |
| Expert Disclosure (Initial) | January 24, 2018 |
| Expert Disclosure (Rebuttal) | February 23, 2018 |
| Expert Discovery Cut-off | March 9, 2018 |
| Last Day to Hear Motions | February 26, 2018 |
| Last Day to Conduct ADR Proceeding | March 2, 2018 |
| File Memorandum of Contentions of Fact and Law, Exhibit and Witness Lists, Status Report regarding settlement, and all Motions in Limine | March 12, 2018 |
| Lodge Pretrial Conference Order, file agreed set of Jury Instructions and Verdict forms, file statement regarding Disputed Instructions and Verdict Forms, and file oppositions | March 19, 2018 |
| Final Pretrial Conference and Hearing on Motions in Limine | April 2, 2018, at 11:00 a.m. |
| Trial Date (Est. 10 Days) | April 24, 2018, at 8:30 a.m. |

///

///

///

///

///

///

///

///

2

# EXHIBIT "C"

> The Bank must explain the important contents of this Letter of Commitment to the Individual, and must issue and deliver the Bank's General Terms and Conditions for Credit Transactions and a duplicate copy of this Letter of Commitment to the Individual.

## Export Factoring Transaction Letter of Commitment (For Revolving Credit Line)



| /s/ | /s/ | /s/ | /s/ |
|---|---|---|---|
| Su Min Han | Jin Ho Joo | Young Hee Lee | [Illegible: Woo Taek Seo?] |

2013 (year) 12 (month) ___ (date)

Authentication of registered seal impression by:

/s/ Jin Wook Chung

Attn: Export-Import Bank of Korea

Individual Address

105-86-66539
Moneal, Inc.  Hong Seuk Park /s/
83, Gasan Digital 1-ro, Geumcheon-gu, Seoul
15th Floor (Gasan-dong, Partners Tower)

Manufacturing, Wholesale Retail, Service

Computers and peripheral computer equipment

I, the Individual, in conducting the transaction regarding "Export Factoring" and its related transactions with the Export-Import Bank of Korea (hereinafter the "Bank"), approve that the Bank's "General Terms and Conditions for Credit Transactions" will be applicable, and affirmatively commit to the articles and provisions set out hereunder.

**Article 1 Scope of Application**

This Letter of Commitment will be applicable to the purchase of export receivables (hereinafter "Export Receivables") arising from the Individual's supply of home servers to ASI Computer Technologies, Inc., and all present and future transactions arising from those Export Receivables.

**Article 2 Export Receivable Purchase Limit, Limit Period of the Transaction, and Receivables Subject to Purchase**

① The Export Receivables purchase (□ exhaustive/☑ revolving) limit amount for this Bank pursuant to this Letter of Commitment will be USD 12 million (USD 12,000,000). In regards to the revolving limit, if the payment for the Export Receivable is collected within the limit period of the transaction as set forth in Paragraph 2, and if it is collected in a normal manner pursuant to this Letter of Commitment, then the same amount as collected will be reinstated.

② The limit period of the transaction pursuant to this Letter of Commitment will be until June  29th, 2014.

③ The payment period for the Receivables subject to purchase pursuant to this Letter of Commitment will be within 180 days, and the purchase ratio will be 100%.

**Article 3 Discount Rate, Processing Fee, and Other Fees**

① The discount rate of the Export Receivables purchase pursuant to this Letter of Commitment will be Libor + markup % of the applicable period of the amount of receivables subject to purchase.

② The export factoring processing fee pursuant to this Letter of Commitment will be 0% of the amount of receivables subject to purchase.

③ Unless additionally generated by a cause within the Bank's responsibility, the Individual will be responsible for all fees and losses relating to this transaction, and will promptly make payment according to an invoice with the calculation basis expressly stated by the Bank.

④ Except in cases where it is difficult to disclose, the Bank will disclose the discount rate, processing fees, and the rates and calculation methods of overall expenses.

⑤ In the event processing fees and such are already set to be charged to a person other than the Individual and the Bank has demanded payment from the other person but has not received payment, the Individual will promptly make payment to the Bank.  However, if the Bank receives payment from the other person after the Bank has already received payment from the Individual, the Bank will then return the aforesaid amount to the Individual.

K00017

**Article 4 Export Receivables Purchase Process**

① The Individual will request the purchase of Export Receivables by submitting the Export Receivables Purchase Application (including related documents) to the Bank three (3) business days prior to the purchase date.

② The Bank will decide whether or not to purchase the Export Receivables by examining relevant commercial invoices and other related documents within the bounds of the balance of the Export Receivables purchase until the date of application including the relevant amount applied for not exceeding the determined purchase limit as set forth in Article 2 Paragraph 1.

③ If the Bank determines that the payment at maturity of the Export Receivables is uncertain or if for any other reason determines that the purchase of the Export Receivables is inappropriate, then the Bank may refuse to purchase.

**Article 5 Assignment of the Export Receivables and Receiving of Purchase Consideration**

① The Individual will assign the Export Receivables applicable to Article 1 and related documents to the Bank, and will receive payment of the purchase price from the Bank for the amount of the purchase price of the Export Receivables net of the discount rate and processing fees as set forth in Article 3.

② Before the purchase of the first Export Receivable according to this Letter of Commitment, the Individual will inform the importer the assignment of the Export Receivables, and make sure that the export price is deposited into an account designated by the Bank.

③ The Bank can set aside up to 20% of the purchase price as a reserve in the event of return, claim, deduction, and other incurred expenses related to this transaction.

**Article 6 Currency and Applicable Exchange Rate**  [*a half seal affixed here*]

The currency for this matter is USD, and the exchange rate will be the rate determined by the Bank on the day of payment of the purchase price.

**Article 7 Representations and Warranties**

The Individual represents and warrant to the Bank that each of the following subparagraphs is true.
1. The Individual acknowledges the legality and validity of the export transaction and this Letter of Commitment, and affirmatively commits to perform in good faith the obligations accompanying the transaction and Letter of Commitment.
2. The amount of the Export Receivables submitted by the Individual, and the payment terms and others are the same as set out in the export agreement, and an obligation occurs for the importer to make payment for the Export Receivables price to the Bank upon the date of purchase of the Export Receivables by the Bank.
3. The Individual has the authority to assign the rights of the Export Receivables, and will implement in good faith all of the requirements and processes necessary for the assignment of the aforementioned rights. The Individual confirms that there will be no legal or actual impediment for the Bank in exercising its right as the possessor of the Export Receivables documents and additional documents.
4. The Individual shall not provide as security collateral the Export Receivables the Individual is applying to the Bank to purchase, and shall not use the same Export Receivables as the basis for receiving  duplicate funds from any other financial institution.
5. After the Individual assigns the Export Receivables to the Bank, the Individual will not consent to any change in the terms and conditions of the Export Receivables without prior consent of the Bank.
6. In regards to the Export Receivables that the Individual has assigned to the Bank, the Individual will make every effort to ensure that no dispute that affects the importer's payment obligations of the export price arises, and will immediately notify the Bank in the event a commercial dispute occurs.

- 2 -

**Article 8 Liability of Repayment of the Export Receivables Purchase Price**

① Except in the instance of Paragraph 2, even if the Export Receivables price is not paid at maturity, the Individual will not bear the obligation to pay the Export Receivables purchase price received from the Bank.

② In the event that either of the subparagraphs below is applicable, the Individual will be obligated to repay the Export Receivables purchase price and will repay at the Bank's request.
1. If the representations made in Article 7 are false or if there is a violation of warranty.
2. If the payment of the Export Receivables price is rejected due to the Individual and importer's nonfulfillment of the export transaction, or a commercial dispute.

③ In regards to Clause 2, if the Export Receivables price is not deposited, then the Individual will pay liquidated damages calculated from the date of the scheduled export price deposit to the actual date of deposit at an additional 2% on top of the discount rate.

**Article 9 Early Termination of the Letter of Commitment**

If the Individual or the Bank seeks to terminate this Letter of Commitment before the term, either party may terminate the Letter of Commitment by notifying the other party in writing 14 business days prior to termination.  However, the Individual must complete payment of the export factoring processing fee and all payments due to the Bank before the termination of the Letter of Commitment.

**Article 10 Applicable Provisions**

If there are no other agreements between both parties regarding matters not set out in this Letter of Commitment, then the Individual and the Bank agree to follow the General Rules for International Factoring (General Rules for International Factoring) set forth by FCI (Factors Chain International).

[*a half seal affixed here*]

105-86-66539
Moneal, Inc.  Hong Seuk Park /s/
83, Gasan digital 1-ro, Geumcheon-gu, Seoul
15th Floor (Gasan-dong, Partners Tower)
Manufacturing, Wholesale Retail, Service
Computers and peripheral computer equipment

Authentication of registered Seal impression by:

/s/ Jin Wook Chung

**Article 11 Miscellaneous Riders**

1. If the exporter is at fault, then an appeal can be made to the exporter under the right of recourse.
2. If the credit of the exporter or importer deteriorates, or otherwise deemed necessary, then the set limit or the operating limit can be canceled or changed.

The Individual has received the Bank's General Terms and Conditions for Credit Transactions and a duplicate copy of this Letter of Commitment, and heard sufficient explanations regarding the material terms, and understands them.

| Individual | |
|---|---|

105-86-66539
Moneal, Inc.  Hong Seuk Park /s/
83, Gasan digital 1-ro, Geumcheon-gu, Seoul
15th Floor (Gasan-dong, Partners Tower)
Manufacturing, Wholesale Retail, Service
Computers and peripheral computer equipment

Authentication of registered Seal impression by:

/s/ Jin Wook Chung

**K00019**

> 은행은 본인에게 이 약정서상의 중요한 내용을 설명하여야 하며,
> 은행여신거래기본약관과 이 약정서의 사본을 교부하여야 합니다.

# 수출팩토링 거래약정서(한도거래용)

2013년 12월    일

한국수출입은행 앞

105-86-66539

(주)모뉴엘    박 홍 석

본  인

주  소   서울특별시 금천구 가산디지털1로 83
           15층(가산동, 파트너스타워)

제조업,도매
소매업,서비스

본인은 한국수출입은행(이하 "은행"이라 합니다)과 "수출팩토링" 및 이에 준하는 거래를 함에 있어 "은행여신거래기본약관"이 적용됨을 승인하고, 다음 각 조항을 확약합니다.

## 제 1 조  적용범위

이 약정은 본인의 ASI Computer Technologies, Inc.앞 홈 서버 공급에 의하여 발생하는 수출채권 (이하 "수출채권"이라 합니다.)의 매입 및 이에 준하는 현재 및 장래의 모든 거래에 적용하기로 합니다.

## 제 2 조  수출채권 매입 한도, 한도거래기간 및 매입대상 채권

① 이 약정에 의한 은행의 수출채권 매입(□소진/☑회전) 한도금액은 USD12백만(USD12,000,000) 으로 합니다. 회전한도는 제2항의 한도거래기간 내에서 이 약정에 의한 수출채권 대금이 정상 회수된 경우에는 동 회수금액만큼 한도가 부활되는 것으로 합니다.

② 이 약정에 의한 한도거래기간은 2014 년 6 월 24 일 까지로 합니다.

③ 이 약정에 의한 매입대상 수출채권의 대금 결제기간은 180 일 이내이며 매입비율은 100%입니다.

## 제 3 조  할인료, 수수료 및 기타비용 등

① 이 약정에 의한 수출채권매입 할인료는 매입대상채권 금액에 대하여 연 해당기간의 Libor+제가산율%로 합니다.

② 이 약정에 의한 수출팩토링 수수료는 매입대상 채권금액의 0%로 합니다.

③ 본인은 은행의 책임 있는 사유로 인하여 추가로 발생한 것이 아닌 한 본건 거래에 따른 모든 비용 및 손해를 부담하며, 은행이 계산근거를 명시하여 청구하는 바에 따라 곧 지급하기로 합니다.

④ 은행은 고시하기 곤란한 경우를 제외하고는 할인료, 수수료 등 제반비용의 요율 및 계산방법을 고시합니다.

⑤ 수수료 등을 본인 이외의 자가 부담하기로 되어 있는 경우에 은행이 본인 이외의 부담자에게 청구하였으나 입금되지 아니하여 본인에게 청구한 때는 본인이 이를 곧 지급하기로 합니다. 다만,

K00017

본인이 이를 지급한 후 은행이 본인 이외의 부담자로부터 지급받는 금액이 있는 경우에는 동 금액을 본인에게 반환합니다.

### 제 4 조  수출채권 매입 절차

① 본인은 수출채권 매입신청서(관련 서류 포함)를 매입일 3영업일전에 은행에 제출하여 수출채권 매입을 의뢰합니다.

② 은행은 당해 신청금액을 포함하여 신청일까지의 수출채권 매입 잔액이 제2조 제1항에서 정하는 매입한도를 초과하지 아니하는 범위내에서 관련 상업송장 및 기타 관련서류 등을 심사하여 수출채권 매입여부를 결정합니다.

③ 은행은 수출채권의 만기지급이 불확실하다고 판단되거나 기타 사유로 수출채권의 매입이 부적절 하다고 판단될 경우에는 매입을 거절할 수 있습니다.

### 제 5 조  수출채권의 양도 및 매입대금 수령

① 본인은 제1조의 거래에 수반하는 수출채권 및 관련서류를 은행에 양도하고 은행으로부터 수출 채권의 매입대상금액에 제3조에서 정한 할인료와 수수료를 제한 매입대금을 지급받습니다.

② 본인은 본 약정에 따른 최초 수출채권 매입 이전에 수입자에게 수출채권 양도사실을 통지하고 수출대금이 은행이 정한 계좌로 입금되도록 합니다.

③ 은행은 본건 거래와 관련하여 반품, 클레임, 공제 및 기타 비용발생에 대비하여 매입대금의 20% 이내의 유보금을 설정할 수 있습니다.

### 제 6 조  통화 및 적용환율 

본건 관련 통화는 USD이며, 적용환율은 매입대금 지급당일에 은행이 정한 환율로 합니다.

### 제 7 조  진술 및 보장

본인은 은행에게 다음 각 호의 사항이 사실임을 진술·보장합니다.

1. 본인은 수출계약과 본 약정이 적법하고 유효함을 인정하며 이에 따른 의무를 성실히 수행할 것을 확약합니다.

2. 본인이 제출한 수출채권의 금액 및 대금결제 조건 등은 수출계약과 동일하고, 채권매입일로부터 수입자가 은행에 수출채권대금을 지급할 의무가 발생합니다.

3. 본인은 수출채권상의 권리를 양도할 적법한 권한을 가지고 있으며, 동 권리의 양도에 필요한 모든 요건 및 절차를 성실히 이행하겠습니다.   은행이 수출채권서류 및 부대서류의 소지인으로서 권리를 행사하는데 법률상 또는 사실상의 장애가 없음을 확인합니다.

4. 본인은 은행에 매입 신청하는 수출채권을 타인에게 담보로 제공하지 아니하며 동 채권을 근거로 어떠한 금융기관으로부터 중복하여 자금을 지원받지 않겠습니다.

5. 본인은 은행에 수출채권을 양도한 이후에 은행의 사전 동의 없이는 당해 수출채권의 어떠한 조건 변경에도 동의하지 않겠습니다.

6. 본인은 은행에 양도한 수출채권과 관련하여 수입자의 수출대금 지급의무에 영향을 미치는 분쟁이 발생하지 않도록 모든 노력을 다하겠으며, 상업분쟁 발생시 동 사실을 은행 앞으로 즉시 통지하 겠습니다.

K00018

제 8 조   수출채권 매입대금 상환의무

① 본인은 제2항의 경우를 제외하고는 수출채권 대금이 만기에 지급되지 아니하더라도 은행으로부터 수령한 수출채권 매입대금을 상환할 의무를 부담하지 아니합니다.

② 다음 각호에서 정한 사유 중 하나에 해당하는 경우에는 본인은 은행의 요청에 따라 수출채권 매입대금의 상환의무를 지고 곧 변제하기로 합니다.
 1. 제7조에 따른 진술이 허위이거나 보장사항을 위반한 경우
 2. 본인이 수입자와의 수출계약 불이행 또는 상업분쟁으로 인하여 수출채권 대금 지급이 거절된 경우

③ 본인은 제2항과 관련하여 수출채권 대금이 입금되지 아니한 경우에는 정상 할인율에 2%를 더한 율로 수출대금 입금예정일로부터 지급일까지 계산한 지연배상금을 지급하기로 합니다

제 9 조   기한 전 약정해지

본인이나 은행은 이 약정을 기한 전에 해지하고자 하는 경우 14영업일 전에 서면으로 상대방에게 통지함으로써 이 약정을 해지할 수 있습니다. 다만 약정 해지 전까지 본인은 수출팩토링 수수료와 은행에 지급하여야 할 모든 비용의 지급을 완료하여야 합니다.

제 10 조   준용규정

본인과 은행은 이 약정서에서 정하지 아니한 사항에 대하여 양 당사자간의 다른 약정이 없는 한 FCI(Factors Chain International)에서 정한 『국제팩토링일반규약』(General Rules for International Factoring) 및 은행의 관련 규정에 따르기로 합니다.

제 11 조 기타 특약사항

105-86-66539
(주)모뉴엘   박 홍
본 엠올특별시 금천구 가산디지털2로
디지털산업2단지 파트너스타워8차
제조업,도매 소매업,서비스
컴퓨터및컴퓨터주변기기외

1. 수출자의 귀책사유가 있는 경우에는 수출자에게 소구함.

2. 수출자 또는 수입자의 신용도가 악화되거나 기타 필요하다고 인정되는 경우에는 설정·운영중인 한도를 취소 또는 변경할 수 있음.

본인은 은행여신거래기본약관 및 이 약정서 사본을 확실히 수령하고, 주요 내용에 대하여 충분한 설명을 듣고 이해하였습니다.

| 본  인 | 105-86-66539<br>(주)모뉴엘   박 홍<br>서울특별시 금천구 가산디지털2로<br>15층(가산동, 파트너스타워)<br>제조업,도매<br>소매업,서비스   컴퓨터및컴퓨터주변기기외 |
|---|---|

## CERTIFICATION OF TRANSLATION

I certify that the provided Korean to English translation of the source document listed below is an accurate and complete rendering of the contents of the source document to the best of my knowledge and ability:

### Export Factoring Transaction Letter of Commitment (For Revolving Credit Line) Dated December 2013

I further certify that I am a qualified professional translator familiar with both languages with more than fifteen years of experience in Korean to English translation of various legal, technical and business documents.

December 27, 2016

Nicole Lee
Certified Court Interpreter (Korean ⬦ English)
State of California
Certification No. 300859

**PLEASE SEE ATTACHED
CURRENT CALIFORNIA
NOTARY FORM**

# California Acknowledgment Form

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of ___LOS ANGELES___ } ss.

On ___12/27/2016___ before me, ___Christian Gutierrez, Notary Public___,
(here insert name and title of the officer)
personally appeared ___NICOLE LEE___

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Seal

CHRISTIAN GUTIERREZ
COMM. # 2093925
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. DEC. 18, 2018

WITNESS my hand and official seal.

Signature of Notary

---

## Optional Information

To help prevent fraud, it is recommended that you provide information about the attached document below.
***This is not required under California State notary public law.***

Document Title:_____ # of Pages:_____

### Notes

---

# EXHIBIT "D"

(Attachment)

**Contents of the Export Factoring Revolving Limit Set-up Approval**

| Section | | Contents |
|---|---|---|
| Applicant (Exporter) | Company Name | Moneual, Inc. |
| | CEO | Hong Seuk Park |
| | Address | 83-1 Partners Tower 15th Floor, Gasan Digital 1-ro, Gasan-dong, Geumcheon-gu, Seoul |
| Subject of the Task | | Export Factoring (one-factor system) |
| Limit Amount | | USD 12 million (US$12,000,000,000.-) |
| Duration of Usage | | 6 months from the date of Revolving Limit Set up |
| Subject of the Receivables | Importer | ASI Computer Technologies, Inc. (United States) |
| | Receivables | The export receivables generated from the supply of home servers and other electronics to the importer |
| Individual Purchase Terms | Approval · Execution Method | Individual export receivables will be purchased within the range and after the confirmation of the spare funds in the revolving limit. |
| | Payment Period | Within 180 days |
| | Discount Rate | USD LIBOR (purchase period) + 1.60%[annotation] |
| | Method to Receive Discount | Prior if purchasing individual export receivables |
| Account for Deposits | | This bank's foreign currency account |
| Retention Bond | | 5% of the total amount of export factoring receivables payment |
| Preservation of Credit | | [Credit: 100%]<br>-Importer (ASI Computer Technologies, Inc.) Credit<br><br><Other preservation of credit><br>-Sales from credit receivables generated by the export transaction will be assigned to this bank<br>- The right of recourse will be from the exporter if there are reasons attributable to the exporter |
| Other terms | | - If the importer or exporter's credit worsens or if determined to be necessary, then the set /operating limit can be canceled or changed.<br><br>- Other individual handling terms will be decided at the time they are handled individually, and will be determined by foreign-exchange business regulations. |

---

[annotation]) The discount rate takes into consideration this bank's additional periodic markup rate at the time of its posting on December 23, 2013, and can be adjusted in the event there is an individual purchase.

K00070

(붙 임)

## 수출팩토링 회전한도 설정 승인내용

| 구 분 | | 내 용 |
|---|---|---|
| 신 청 인<br>(수 출 자) | 상 호 | ㈜모뉴엘 |
| | 대표자 | 박 홍 석 |
| | 주 소 | 서울특별시 금천구 가산동 가산디지털 1로 83 파트너스타워 1차 15층 |
| 대 상 업 무 | | 수출팩토링(직접방식) |
| 한 도 금 액 | | U$12백만(U$12,000,000.-) |
| 사 용 기 간 | | 회전한도 설정일로부터 6월 |
| 대상<br>채권 | 수 입 자 | ASI Computer Technologies, Inc. (미국) |
| | 채 권 | 수입자 앞 홈 서버 등 전자제품 공급에 따라 발생한 수출채권 |
| 개별<br>매입<br>조건 | 승인·집행<br>방 법 | 회전한도 여유금액 범위 내 확인 후 개별 수출채권 매입 |
| | 결제기간 | 180일 이내 |
| | 할인료율 | U$ LIBOR(매입기간) + 1.60%<sup>주)</sup> |
| | 할 인 료<br>받는방법 | 개별 수출채권 매입시 선취 |
| 입 금 계 좌 | | 당행 외화계좌 |
| 유 보 금 | | 수출팩토링 채권대금의 5% |
| 채 권 보 전 | | 【신용 : 100%】<br>- 수입자(ASI Computer Technologies, Inc.) 신용<br>< 기타 채권보전 ><br>- 수출거래로부터 발생하는 외상매출채권을 당행에 양도<br>- 수출자의 귀책사유가 있는 경우에는 수출자에게 소구 |
| 기 타 조 건 | | - 수입자 또는 수출자의 신용도가 악화되거나 기타 필요하다고 인정되는 경우에는 설정·운영중인 한도를 취소 또는 변경할 수 있음.<br>- 기타 세부취급조건은 외국환업무 관련규정에서 정한 바에 따라 개별 취급시에 정함. |

주) '13. 12. 23자 당행 고시 기간가산율을 감안한 할인료율이며, 개별 매입 시 조정 가능

K00070

## CERTIFICATION OF TRANSLATION

I certify that the provided Korean to English translation of the source document(s) listed below is an accurate and complete rendering of the contents of the source document to the best of my knowledge and ability:

**Contents of the Export Factoring Revolving Limit Set-up Approval
Bates Number K00070**

I further certify that I am a qualified professional translator familiar with both languages with more than fifteen years of experience in Korean to English translation of various legal, technical and business documents.

January 9, 2017

- see attached certificate

Nicole Lee
Certified Court Interpreter (Korean <> English)
State of California
Certification No. 300859

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**          GOVERNMENT CODE § 8202

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

_____          _____
Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of ___Los Angeles___

Subscribed and sworn to (or affirmed) before me

on this __9__ day of __January__, 20 _17_,
             Date              Month              Year

by _____
(1)_____Nicole Lee_____

(and (2)_____),
                    Name(s) of Signer(s)

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

SEAN N. CHO
Commission # 2041634
Notary Public - California
Los Angeles County
My Comm. Expires Sep 17, 2017

Signature _____
                    Signature of Notary Public

Seal
Place Notary Seal Above

━━━━━━━━━━━━━━━ OPTIONAL ━━━━━━━━━━━━━━━

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: __Certification of Translation__          Document Date: __01/09/2017__

Number of Pages: __1__  Signer(s) Other Than Named Above: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5910