BRYAN A. MERRYMAN (SBN: 134357)
bmerryman@whitecase.com
JAMES K. LEE (SBN: 162350)
jklee@whitecase.com
EARLE MILLER (SBN: 116864)
emiller@whitecase.com
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, California  90071
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329

Attorneys for Plaintiff
THE EXPORT-IMPORT BANK OF KOREA

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE EXPORT-IMPORT BANK OF KOREA, an agency or instrumentality of the Republic of Korea,<br><br>         Plaintiff,<br><br>    v.<br><br>ASI CORPORATION, a Delaware corporation; ASI COMPUTER TECHNOLOGIES, INC., a California corporation; BILL CHEN a/k/a TA WEI CHEN, an individual; HENRY CHEN a/k/a HUNG CHEN, an individual; FRANCES CHOU a/k/a MEI LING CHOU a/k/a FRANCES MEILING CHOU, an individual; CHRISTINE LIANG a/k/a CHRISTINE LI-YIN LIANG a/k/a LI YIN CHU, an individual,<br><br>         Defendants. | Case No.  2:16-cv-2056-MWF-JPR<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**(1)  FRAUD;**<br><br>**(2)  NEGLIGENT MISREPRESENTATION;**<br><br>     **AND**<br><br>**(3)  NEGLIGENT SUPERVISION**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff The Export-Import Bank of Korea ("**KEXIM**") complains of defendants and alleges as follows:

1.      In October 2014, a company called Moneual, Inc., a manufacturer of computers and home appliances, shocked the nation of South Korea when it was exposed for perpetrating one of the biggest cases of fraud in Korea's history.  A Korean court described the scandal as a crime that "gravely undermined the trust of the society in general toward the financial system" and "caused a real risk that may put a damper on the trade insurance system and export finance system."  Through fraudulent means, Moneual received loans exceeding $3 billion and victimized ten major Korean banks, including KEXIM.

2.      Moneual orchestrated an elaborate scheme of circular transactions through which it sold fraudulent receivables based on purchase orders issued by foreign importers, such as the defendants, ASI Corporation and its affiliate ASI Computer Technologies, Inc., who participated in the fraud scheme.  Moneual then sold additional receivables to pay for the previously sold receivables, when in fact little to nothing was exported.  Moneual management personnel involved in the fraud – including its Chief Executive Officer, Hong-seok Park, the ringleader and CEO of Moneual – have been imprisoned and fined.

3.      Moneual secured the connivance of its foreign importers in its fraudulent scheme by paying kickbacks to executives and employees of those companies, including executives and employees of the defendants.

4.      Here, KEXIM sues one of the participants in Moneual's fraudulent scheme, a California-based importer of goods from Moneual, against whose invoices from Moneual KEXIM paid Moneual approximately $52 million, of which approximately $40 million has never been repaid.  KEXIM also sues four executives of that importer, each of whom actively participated in the scheme to defraud KEXIM and each of whom accepted hundreds of thousands, or millions, of dollars in kickbacks to do so.

- 1 -

## THE PARTIES

5.       KEXIM is a bank incorporated under the laws of the Republic of Korea within the Ministry of Finance of Korea.  KEXIM is an agency or instrumentality of the Republic of Korea as defined by 28 U.S.C. § 1603(b), with its principal place of business in Seoul, Korea.

6.       KEXIM is the official export credit agency of the Republic of Korea. It provides comprehensive export loan and guarantee programs to support Korean enterprises conducting business overseas.  Its primary services include export financing, trade financing, and guarantee programs to strengthen its clients' competitiveness in global markets.

7.       KEXIM provides numerous types of financing, including export promotion loans, export growth loans, export project loans, export facilitation loans, overseas investment and project loans.  KEXIM structures and funds major infrastructure projects around the world, from Mexico to Morocco to Indonesia, including such projects as the ENEC nuclear power project in Abu Dhabi and the Bosporus tunnel project in Istanbul, Turkey, linking Europe and Asia.  Project Finance International, the leading reporter on the international project finance industry, named KEXIM the 2012 Global Multilateral of the Year.  In 2014 and 2015, loans by KEXIM supported total foreign investment of approximately $27 billion each year.

8.       Defendant ASI Computer Technologies, Inc. ("**ASI Computer**") is a California corporation.   Former defendant ASI Corporation ("**ASI Corp.**") is or was a Delaware corporation.  KEXIM is informed and believes and on that basis alleges that ASI Corp. is or was an affiliate of ASI Computer; that ASI Corp. purports to have been merged into ASI Computer; but that at all relevant times, and continuing through the date of filing this Complaint, the defendants continued to use the ASI Corp. name and entity for some purposes.  Each of ASI Corp. and ASI Computer maintains a place of business at its regional office located at 19850 E.

Business Parkway in Walnut, California.  In communications with third persons,
ASI Corp. and ASI Computer frequently do not distinguish between themselves,
and treat their officers, directors, employees, and agents as affiliated
interchangeably with either or both entities.  ASI Corp. and ASI Computer share an
email domain, @asipartner.com.  Unless otherwise specified, ASI Corp. and ASI
Computer are collectively referred to in this Complaint as "**ASI**."  ASI is a
wholesale distributor of computer software, hardware, and accessories.  KEXIM is
informed and believes and on that basis alleges that ASI was founded and
personally cultivated by Christine Liang, ASI's President, over a period of more
than thirty years to become one of Silicon Valley's largest family-owned businesses
with revenues exceeding $1 billion in 2014.

9.     KEXIM is informed and believes and on that basis alleges that at all
relevant times defendant **Bill Chen** a/k/a Ta Wei Chen was an officer, to wit, Vice
President of Finance, of ASI Corp. and/or ASI Computer, and a citizen and resident
of California.  As Vice President of Finance, Bill Chen was responsible for (1)
overseeing ASI's accounting and credit departments, (2) overseeing ASI's
budgeting, financial forecasting, and cash flow, and (3) reviewing and approving
ASI's financial reporting materials.

10.     KEXIM is informed and believes and on that basis alleges that at all
relevant times defendant **Henry Chen** a/k/a Hung Chen is or was an officer, to wit,
Vice President of Business Development, of ASI Corp. and/or ASI Computer, and a
citizen and resident of California.  As Vice President of Business Development,
Henry Chen was responsible for (1) overseeing product management and marketing
with vendors and customers, (2) overseeing new business development with
customers, (3) developing strategic business planning with vendors and ASI's
product managers, (4) supervising ASI's product managers' performance and
revenue goal, and (5) managing ASI's product directors and managers.

11.　　KEXIM is informed and believes and on that basis alleges that at all relevant times defendant **Frances Chou** a/k/a Mei Ling Chou a/k/a Frances Meiling Chou was a director and agent of ASI Corp. and/or ASI Computer, authorized to act on behalf of ASI Corp. and/or ASI Computer, including entering into contracts and transactions on their behalf, and a citizen and resident of California.  As ASI's director and agent, Frances Chou acted as a liaison between ASI and its vendors and customers and handled purchase order related matters.

12.　　KEXIM is informed and believes and on that basis alleges that at all relevant times defendant **Christine Liang** a/k/a Christine Li-Yin Liang a/k/a Li Yin Chu was an officer, to wit, President, of ASI Corp. and/or ASI Computer, and a citizen and resident of California.  KEXIM is informed and believes and on that basis alleges that at all relevant times, defendant Christine Liang controlled the activities of ASI central to this Second Amended Complaint.  Bill Chen, Henry Chen, Frances Chou, and Christine Liang are referred to collectively as the "**Individual Defendants**."

## OTHER PERSONS RELEVANT TO THE COMPLAINT

13.　　Moneual Inc. ("**Moneual**") was a prominent Korean manufacturer of computers and home appliances, including robot vacuum cleaners and various types of personal computers.  ASI purchased, or purported to purchase, products from Moneual for import into the United States, Canada, and Latin America.

14.　　Hong-seok (Harold) Park ("**HS Park**") was the Chief Executive Officer of Moneual until his arrest and conviction for masterminding the massive fraud that is the subject of this lawsuit.  HS Park is currently serving a 15-year prison sentence in Korea for that conviction.

15.　　PK Paradigms Holdings Ltd. ("**PK Paradigms**") was a shell company incorporated in Hong Kong, which was controlled by HS Park and managed by his high school friend Jeff Kim.  PK Paradigms was used by HS Park to facilitate Moneual's circular fraudulent transactions with ASI.  HS Park also used PK

- 4 -

1  Paradigms to pay kickbacks to ASI's executives in return for their and ASI's

2  participation in Moneual's fraud scheme.

3                    **JURISDICTION AND VENUE**

4         16.    KEXIM invokes this Court's jurisdiction under 28 U.S.C. §

5  1332(a)(4).  Plaintiff is an agency or instrumentality of the Republic of Korea, a

6  foreign state, and defendants are citizens of Delaware and California.  Complete

7  diversity of citizenship therefore exists between the parties.  The amount in

8  controversy in this action exceeds $75,000 exclusive of interest and costs.

9         17.    Venue is proper in this District pursuant to 28 U.S.C. § 1441(b)(1).

10  Each defendant is a resident of California and the corporate defendants maintain a

11  place of business in Walnut, California, within this District and subject to the

12  personal jurisdiction of this Court.

13                    **FACTUAL ALLEGATIONS**

14  **Moneual Establishes Itself as a Prosperous and Fast-Growing Company**

15        18.    In or about August 2007, HS Park acquired Dign Lab Co., Ltd.

16  ("**Dign**"), a privately-held company that manufactured and sold robotic vacuum

17  cleaners and other home appliances.  HS Park had been involved in Dign's

18  management since approximately 2005.  After acquiring Dign, HS Park assumed

19  the role of Chief Executive Officer, and on November 27, 2007, he changed the

20  name of the company to Moneual.  Moneual sold TVs, PCs, netbook computers,

21  and robotic vacuum cleaners.

22        19.    Until its demise, Moneual was publicly perceived in Korea as a

23  successful company on a rapid growth trajectory.  For example, Moneual

24  participated in a highly successful national sales campaign by Lotte Mart, one of

25  Korea's leading retailers, called "Tong Keun" ("magnanimous").  Moneual entered

26  into an agreement to supply Lotte Mart with netbook computers – small, relatively

27  less powerful laptops that are used mainly for web surfing – for Lotte Mart's "Tong

28  Keun Netbook" campaign in 2010.

20.     The "Tong Keun TV" campaign in 2011 proved even more popular. Moneual's strategy was to incorporate average to high quality LED screens inside basic frames made of plastic.  This made its production costs significantly lower than those of other, better known TV brands that used modern designs and more expensive materials.  People waited in line for hours outside Lotte Mart to purchase the TVs and the promotion generated widespread media attention.

21.     Moneual also won the Microsoft Innovation Award at the prestigious Consumer Electronics Show in Las Vegas for three consecutive years from 2007 to 2009.  Such achievements, the success of the "Tong Keun" campaigns, and widespread media exposure through prime time TV commercials and the news, quickly earned Moneual major name recognition in Korea.  As a result, third persons believed that Moneual was a legitimate and successful business enterprise.

**KEXIM Factors Moneual's Export Receivables**

22.     KEXIM's Small and Medium-Sized Entrepreneur Finance Department ("**SME**") makes commercial loans to small and medium-sized businesses in accordance with the Korean government's policy to support such enterprises.  Since the 2000s, Moneual was a major customer of KEXIM's SME.

23.     KEXIM's Structured Trade Finance Department ("**STF**") is responsible for KEXIM's factoring business.  Factoring is a form of lending under which a lender purchases a business's trade receivables at a discount to their face value, advancing money to the business and collecting the receivable from the business's customer at its maturity.  Factoring is a recognized method of enhancing a business's cash flow by enabling the business to receive payment for customer orders immediately or shortly after shipment of goods, before the customer would be required to pay for the goods under its agreed trade terms with the seller.  The customer pays the factor directly when the invoice comes due.  Factoring is widely used by businesses for both domestic and international sales.

AMERICAS 94066627 (2K)                                        SECOND AMENDED COMPLAINT

24.     In June 2013, Moneual requested that KEXIM factor Moneual's export receivables due from its customer China National Building Materials & Equipment Import & Export Corporation ("**CBMIE**").  CBMIE is a subsidiary of China National Building Materials Group Corporation, a Chinese state-owned enterprise which is the largest comprehensive building materials industry group in China, with 100,000 employees and over $16 billion in total assets.  Moneual claimed that it needed financing because all of its sales were credit transactions and, as a result, it did not have enough liquidity to sustain its rapidly increasing production demands.

25.     KEXIM assessed the business opportunity.  Given Moneual was a long-standing client of SME, STF focused on conducting a drawdown diligence of Moneual such as reevaluating previous internal credit evaluations and reviewing audit reports issued on Moneual.  Among other things, KEXIM also conducted a credit evaluation of CBMIE by contacting major credit rating agencies such as Moody's and S&P, as well as smaller agencies such as Dun & Bradstreet ("**D&B**") and Korea Enterprise Data, which primarily cover small to medium-sized enterprises.

26.     Jong-Hyun (John) Lee ("**JH Lee**"), KEXIM's Director of STF's International Factoring Team, also visited Moneual's headquarters in Seoul in or about August 2013.  During the visit, Moneual's management convinced KEXIM that Moneual had a number of successful products, and was busily developing new and innovative products.  Moneual had prototypes on display and impressive brochures.  Based in part on Moneual's representations during this visit, KEXIM ultimately decided to expand its business with Moneual to include a factoring relationship.

27.     In August 2013, KEXIM and Moneual entered into an Export Factoring Agreement for Moneual's exports to CBMIE, to be renewed annually. The factoring agreement was with recourse to Moneual, which meant that Moneual would be financially responsible for payment on the receivables purchased by

- 7 -

KEXIM.  While non-recourse factoring was the general market practice at the time
for similar transactions, the CBMIE factoring agreement deviated from this practice
to mitigate KEXIM's risk from its first factoring transaction with Moneual.

28.    On or about August 19, 2013, KEXIM made its first purchase of
Moneual's export receivables due from CBMIE.  KEXIM initially purchased a total
amount of receivables of $20 million, payable on February 14, 2014.  KEXIM
received timely payment for that initial purchase from Moneual rather than from the
customer CBMIE.

29.    The successful consummation of this first factoring transaction gave
KEXIM comfort as to Moneual's bona fides and creditworthiness, and induced
KEXIM to enter into additional factoring transactions with Moneual as described
below, including maintaining and renewing an Export Factoring Agreement for
Moneual's exports to ASI.  In reality, the successful initial transaction with CBMIE
(and later the successful initial transaction with ASI) was merely a ruse by Moneual
to provide KEXIM with the illusion that Moneual operated a genuine export
business with legitimate customers and transactions and thereby to induce KEXIM
to continue to finance Moneual's receivables transactions.

30.    On or about October 15, 2013, Moneual entered into an "OEM Suppy
[sic] Agreement" (the "**Supply Agreement**") with ASI Corp.  Under the Supply
Agreement, ASI Corp. was to be the exclusive importer and distributor of Moneual
products within the United States, Canada, and Latin America.  Payment for orders
was due on a net 180 days basis.  The Supply Agreement is governed by California
law.

31.    In the Supply Agreement, ASI Corp. guaranteed to purchase $200
million of Moneual products within the first year and $400 million within the
second – in hindsight, a phenomenally large commitment, representing nearly 30%
of ASI Corp.'s total revenue, which KEXIM is informed and believes and on that
basis alleges would have been impossible, or, at a minimum, onerous, for ASI

- 8 -

1   Corp. to meet.  That was especially true given Moneual's minimal market exposure

2   and limited brand recognition in the North and Central American territories where

3   ASI Corp. was to distribute its products, such that ASI Corp. would have been

4   confronted with great difficulty reselling the Moneual products.

5       32.   The Supply Agreement was executed on behalf of Moneual by HS

6   Park and on behalf of ASI Corp. by defendant Frances Chou as Director of ASI

7   Corp.  The Supply Agreement stated that the parties executing the agreement had

8   the requisite authority to do so.

9       33.   The terms of the Supply Agreement were similar to the Distribution

10   Agreement entered into by and between Moneual and ASI Computer on January 1,

11   2007 (the "**Distribution Agreement**"), which was executed on behalf of Moneual

12   by HS Park as CEO of Moneual and on behalf of ASI Computer by defendant

13   Christine Liang as President of ASI.  The Distribution Agreement is governed by

14   California law.

15       34.   KEXIM is informed and believes and on that basis alleges that ASI

16   and its executives, including Christine Liang, began assisting Moneual in

17   implementing its fictitious and/or fraudulent export-import transactions under the

18   guise of the Distribution Agreement since 2007.  One primary difference between

19   the Supply Agreement and the Distribution Agreement was that the latter did not

20   contain the purchase guarantee described in paragraph 30 above.  KEXIM is

21   informed and believes and on that basis alleges that Moneual and ASI Corp. entered

22   into the Supply Agreement to add lucrative purchase requirement provisions, which

23   would heighten the appeal of factoring Moneual's receivables from ASI and

24   thereby induce KEXIM to factor the receivables.

25       35.   After entering into the Supply Agreement, Moneual requested KEXIM

26   to factor its export receivables due from ASI Computer.  KEXIM carried out an

27   evaluation of ASI's creditworthiness as part of its due diligence process.  In

28   connection with that evaluation, KEXIM contacted credit rating agencies, including

- 9 -

D&B, to receive a ratings report on ASI.  However, ASI's credit rating failed to meet KEXIM's internal ratings requirements.  KEXIM communicated this fact to Moneual.  Shortly thereafter, in May 2014, Moneual's agent Kyeong-Shik Kang ("**KS Kang**") informed KEXIM that ASI's ratings had improved.  KS Kang explained that ASI had provided its updated D&B credit rating to Moneual per HS Park's request.  KEXIM requested another ratings report on ASI from D&B and confirmed that ASI's ratings had indeed improved and met KEXIM's internal ratings requirements.

36.     KEXIM is informed and believes and on that basis alleges that ASI's ratings were based in part on ASI's income statement, which reflected ASI's voluminous purchase and sale of products manufactured by Moneual to paper companies as part of Moneual's circular export-import transactions with ASI in a scheme to defraud banks, including KEXIM.  As early as June 2012, ASI knew that its credit ratings would be considered by banks in their decision to extend loans and other credit arrangements such as factoring to Moneual.  ASI submitted its financial information to credit ratings agencies such as D&B requesting that they update ASI's credit file, and communicated these efforts to Moneual.  For example, on or about June 26, 2012, defendant Bill Chen forwarded HS Park an email he had received from D&B informing ASI that its credit file had been updated to reflect ASI's income statement data.  ASI would have no reason to alert Moneual that its credit file with ratings agencies had been updated unless ASI anticipated and knew that Moneual would use this information to secure loans and other financings from financial institutions such as KEXIM.  KEXIM is informed and believes and on that basis alleges that ASI and at the least, defendant Bill Chen, knew that KEXIM would rely on ASI's D&B ratings report, which was partly based on fraudulent transactions between ASI and Moneual and other Moneual-controlled paper companies, when entering into a factoring agreement for Moneual's receivables from ASI.

AMERICAS 94066627 (2K)

37.     KS Kang also sent KEXIM a certification of ASI Computer's business history prepared by the Korea Trade Insurance Corporation ("**KSURE**"), Korea's official export credit agency.  KSURE is a corporation under the Korean Ministry of Trade, Industry and Energy, whose functions include the operation of trade insurance programs relating to the export and import of goods, and the provision of credit-related services including credit research and credit information management for Korean enterprises.

38.     The KSURE certification that Moneual delivered to KEXIM in support of ASI's creditworthiness, dated November 20, 2013, purported to contain Moneual's export performance data for each of its customers, including ASI Computer, for the years 2006-2013.  This document showed substantial export figures and full collection of those amounts, and was therefore material in persuading KEXIM to approve the factoring of Moneual's export receivables due from ASI Computer.  The document also showed a dramatic rise in Moneual's exports to ASI Computer between 2006 and 2012, from less than $1 million in 2006, to approximately $81 million in 2009, and over $180 million in 2012, which amounts were purportedly insured by KSURE and subsequently collected in full.

39.     Those figures later proved to be false.  KEXIM is informed and believes and on that basis alleges that, in fact, those figures were highly inflated, and reflected fictitious and/or fraudulent transactions between Moneual and ASI Computer.  Moneual supplied those figures to KEXIM with the intent to deceive KEXIM into entering into a factoring agreement for Moneual's receivables from ASI Computer and making available to Moneual a credit facility in the tens of millions of dollars.

40.     When KEXIM requested additional documents from Moneual to support ASI's creditworthiness, Moneual requested that KEXIM communicate directly with ASI's Vice President of Finance, defendant Bill Chen, and gave KEXIM his email address.  On November 18, 2013, KEXIM sent an email to Bill

- 11 -

Chen and requested ASI Computer's financial statements. On November 19, 2013, Bill Chen replied from his ASI email account and attached ASI's 2010-2012 balance sheets and income statements to his email, although they were missing the auditor's signature. On November 22, 2013, following KEXIM's request for the statements with the auditor's signature in place, Bill Chen sent the auditor's cover letter and opinion.

41.     KEXIM is informed and believes and on that basis alleges that the financial statements sent by Bill Chen incorporated voluminous fictitious and/or fraudulent transactions between ASI and Moneual, thereby significantly inflating ASI's income statement figures. ASI knew that its financial statements were inaccurate and gave the false appearance that its distribution business was larger than reality. The Individual Defendants did not disclose this fact to KEXIM. KEXIM reasonably relied on the financial statements as accurate and based on genuine business transactions of ASI. KEXIM is informed and believes and on that basis alleges that defendants Bill Chen, in his capacity of ASI's Vice President of Finance, and Christine Liang, as President of ASI, reviewed and approved the false financial statements.

42.     In or about December 2013, in reliance on the information provided by Moneual, ASI, and credit agencies, KEXIM entered into an Export Factoring Agreement with Moneual to factor Moneual's exports to ASI Computer, without recourse against Moneual. The successful consummation of the first CBMIE factoring transaction gave KEXIM comfort as to the legitimacy of Moneual's export transactions, and induced KEXIM to enter into a non-recourse agreement with Moneual consistent with market practice. KEXIM and Moneual subsequently entered into new Export Factoring Agreements on or about June 25, 2014, and on or about September 19, 2014, each on substantially the same terms, and the three Export Factoring Agreements are collectively referred to as the "**EFA**." Under the EFA, Moneual agreed to sell and KEXIM agreed to purchase Moneual's rights and

SECOND AMENDED COMPLAINT

benefits to receive payments from ASI Computer for the commercial invoices Moneual sent to ASI Computer for its shipments of goods.

43.     Moneual's initial credit limit under the EFA was $12 million.  The June 2014 agreement increased Moneual's credit limit to $29 million and the September 2014 agreement increased Moneual's credit limit to $40 million. KEXIM granted each increase in Moneual's credit limit at Moneual's request, based on Moneual's representations to KEXIM that Moneual had outstanding invoices to ASI Computer in those amounts which it asked KEXIM to factor.

44.     After KEXIM and Moneual entered into the EFA in December 2013, Moneual sent ASI Computer a notification informing ASI Computer that it should make payments on Moneual's invoices directly to KEXIM.  The notification was signed by Moneual's CEO, HS Park, and acknowledged by defendant Frances Chou, as "Director."  Moneual sent an essentially identical notification to ASI Computer in 2014, signed and acknowledged by the same persons.

45.     At some point after Moneual and ASI Corp. entered into their Distribution Agreement in January 2007, KEXIM is informed and believes and on that basis alleges that in furtherance of the fraud ASI Computer began placing bogus purchase orders with Moneual for the purported purchase of home theater personal computers ("**HTPCs**") and other goods manufactured by Moneual or its subsidiaries or affiliates.  The Supply Agreement was simply another ruse to induce KEXIM to enter into the EFAs with Moneual.  In all, KEXIM is informed and believes and on that basis alleges that ASI placed 36 such purchase orders in four sets, as more fully described below.

46.     The First Set of Purchase Orders.  On or about November 21, 2013, ASI Computer issued eight purported purchase orders, numbered 897680-000 OP, 897681-000 OP, 897682-000 OP, 897683-000 OP, 897684-000 OP, 897685-000 OP, 897686-000 OP and 897687-000 OP.  Each purported purchase order was for 500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000.  In total,

- 13 -

the eight purported purchase orders in this set (the "**First Set of Purchase Orders**") amounted to an aggregate order of $11,920,000.  According to the purchase orders, payment was due 180 days from the bill of lading date.

47.     On or about December 18, 2013, Moneual purportedly shipped the goods called for in the First Set of Purchase Orders to the location specified by the purchaser in Hong Kong.  Moneual sent invoices to ASI Computer for an aggregate amount of $11,920,000.  The invoices that Moneual issued to ASI for the First Set of Purchase Orders listed Moneual as the seller, ASI Computer located in Fremont, California, as the consignee, and ASI Computer Technologies Inc. located in Hong Kong as the notify party.  KEXIM is informed and believes and on that basis alleges that ASI Computer Technologies Inc. located in Hong Kong refers to ASI Computer Technologies (HK) Limited ("**ASI (HK)**"), an affiliate of ASI incorporated in 2012, for the purpose of implementing Moneual's fraudulent export-import transactions.  HS Park, identified in the invoices as CEO of Moneual, signed the invoices.

48.     Moneual submitted to KEXIM the purchase orders and the attendant packing lists, commercial invoices, and inland bills of lading as part of its application to sell the export receivables due from ASI under the First Set of Purchase Orders.  The application to sell the receivables was reviewed and approved by KEXIM's STF.  The supporting documents on their face did not give any indication of the underlying fraudulent scheme.  Since at least 2010, however, ASI knew that banks were relying on the genuineness of its purchase orders to factor Moneual's receivables and, since at least December 2013, when ASI received notification from Moneual that KEXIM would be factoring ASI receivables, ASI knew that KEXIM was relying on the genuineness of its purchase orders when it agreed to factor Moneual's receivables due from ASI.  Nevertheless, ASI did not inform KEXIM that the First Set of Purchase Orders was bogus and that the Individual Defendants had received significant kickbacks for ASI's participation in

Moneual's fraudulent circular transactions.  On or about January 7, 2014, pursuant to the EFA, KEXIM purchased Moneual's purported account receivable from ASI Computer for the invoices pertaining to the First Set of Purchase Orders.

49.     Payment for the goods represented by the First Set of Purchase Orders was due on June 16, 2014, and on or about that date KEXIM received the sum of $11,919,960 by wire transfer from an account in the name of ASI (HK).

50.     The Second Set of Purchase Orders.  On or about April 21, 2014, ASI Computer issued eight purported purchase orders, numbered 926948-000 OP, 926949-000 OP, 926950-000 OP, 926951-000 OP, 926952-000 OP, 926953-000 OP, 926954-000 OP and 926955-000 OP.  Each purported purchase order was for 500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000.  In total, the eight purported purchase orders in this set (the "**Second Set of Purchase Orders**") amounted to an aggregate order of $11,920,000.  According to the purchase orders, payment was due 180 days from the bill of lading date.

51.     On or about June 12, 2014, Moneual purportedly shipped the goods called for in the Second Set of Purchase Orders to the location specified by the purchaser in Hong Kong.  Moneual sent an invoice to ASI Computer for $11,920,000.  The invoices that Moneual issued to ASI for the Second Set of Purchase Orders listed Moneual as the seller, ASI Computer in Fremont, California, as the consignee, and ASI Computer Technologies Inc. located in Hong Kong as the notify party.  KEXIM is informed and believes and on that basis alleges that ASI Computer Technologies Inc. located in Hong Kong refers to ASI (HK).  HS Park, identified in the invoices as CEO of Moneual, signed the invoices.

52.     Moneual submitted to KEXIM the purchase orders and the attendant packing lists, commercial invoices, and domestic shipment waybills as part of its application to sell the export receivables due from ASI under the Second Set of Purchase Orders.  The application to sell the receivables was reviewed and approved by KEXIM's STF.  The supporting documents on their face did not give

- 15 -

any indication of the underlying fraudulent scheme.  At this time, however, ASI undoubtedly knew that KEXIM was relying on the genuineness of its purchase orders to factor Moneual's receivables given in December 2013 as well as sometime in 2014, ASI received notifications from Moneual that KEXIM was factoring ASI receivables, and on June 16, 2014, ASI paid KEXIM for the First Set of Purchase Orders.  Nevertheless, ASI did not inform KEXIM that the Second Set of Purchase Orders was bogus and that the Individual Defendants had received significant kickbacks for ASI's participation in Moneual's fraudulent circular transactions.  On or about June 19, 2014 (approximately three days after receiving payment for the money it advanced on the First Set of Purchase Orders), pursuant to the EFA, KEXIM purchased Moneual's purported account receivable from ASI Computer for the invoices pertaining to the Second Set of Purchase Orders.

53.    Payment for the goods represented by the Second Set of Purchase Orders was due on December 9, 2014.  ASI Computer defaulted on that payment and KEXIM has never received payment for the money it advanced on the Second Set of Purchase Orders.

54.    <u>The Third Set of Purchase Orders</u>.  On or about May 8, 2014, ASI Computer issued ten purported purchase orders, numbered 931068-000 OP, 931069-000 OP, 931070-000 OP, 931071-000 OP, 931072-000 OP, 931073-000 OP, 931074-000 OP, 931075-000 OP, 931076-000 OP and 931077-000 OP.  Nine of the ten purported purchase orders were for 500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000; the tenth was for 200 units of HTPCs at $2,980 each, totaling $596,000.  ASI Computer had also issued two additional purported purchase orders on April 21, 2014 (in addition to the eight issued on that day which formed the Second Set of Purchase Orders), numbered 926956-000 OP and 926957-000 OP, each for 500 units of HTPCs at the price of $2,980 per unit, totaling $1,490,000.  The goods under those two purported purchase orders were shipped and invoiced together with those under the ten purported purchase orders

issued on May 8, 2014.  In total, the twelve purported purchase orders in this set (the "**Third Set of Purchase Orders**") amounted to an aggregate order of $16,986,000.   According to the purchase orders, payment was due 180 days from the bill of lading date.

55.    On or about June 17, 2014, Moneual purportedly shipped the goods called for in the Third Set of Purchase Orders to the location specified by the purchaser in Hong Kong.  Moneual sent an invoice to ASI Computer for $16,986,000.  The invoices that Moneual issued to ASI for the Third Set of Purchase Orders listed Moneual as the seller, ASI Computer Technologies Inc. located in Hong Kong as the consignee and notify party, and ASI Computer in Fremont, California as the buyer.  KEXIM is informed and believes and on that basis alleges that ASI Computer Technologies Inc. located in Hong Kong refers to ASI (HK).  HS Park, identified in the invoices as CEO of Moneual, signed the invoices.

56.    Moneual submitted to KEXIM the purchase orders and the attendant packing lists, commercial invoices, and domestic shipment waybills as part of its application to sell the export receivables due from ASI under the Third Set of Purchase Orders.  The application to sell the receivables was reviewed and approved by KEXIM's STF.  The supporting documents on their face did not give any indication of the underlying fraudulent scheme.  At this time, however, ASI undoubtedly knew that KEXIM was relying on the genuineness of its purchase orders to factor Moneual's receivables given in December 2013 as well as sometime in 2014, ASI received notifications from Moneual that KEXIM was factoring ASI receivables, and on June 16, 2014, ASI paid KEXIM for the First Set of Purchase Orders.  Nevertheless, ASI did not inform KEXIM that the Third Set of Purchase Orders was bogus and that the Individual Defendants had received significant kickbacks for ASI's participation in Moneual's fraudulent circular transactions.  On or about June 26, 2014 (a week after purchasing the purported

1   account receivable from ASI Computer for the invoices pertaining to the Second

2   Set of Purchase Orders, and after acceding to Moneual's request to increase

3   Moneual's credit limit to accommodate this new purchase), pursuant to the EFA,

4   KEXIM purchased Moneual's purported account receivable from ASI Computer for

5   the invoices pertaining to the Third Set of Purchase Orders.

6        57.    Payment for the goods represented by the Third Set of Purchase Orders

7   was due on or about December 14, 2014.  ASI Computer defaulted on that payment

8   and KEXIM has never received payment for the money it advanced on the Third

9   Set of Purchase Orders.

10       58.    The Fourth Set of Purchase Orders.  On or about August 20, 2014, ASI

11  Computer issued eight purported purchase orders, numbered 953143-000 OP,

12  953144-000 OP, 953145-000 OP, 953146-000 OP, 956894-000 OP, 956895-000

13  OP, 956896-000 OP and 956897-000 OP.  Seven of the eight purported purchase

14  orders were for 500 units of HTPCs at the price of $2,980 per unit, totaling

15  $1,490,000; the eighth was for 220 units of HTPCs at $2,980 per unit, totaling

16  $655,600.  In total, the eight purported purchase orders in this set (the "**Fourth Set**

17  **of Purchase Orders**") amounted to an aggregate order of $11,085,600.  According

18  to the purchase orders, payment was due 180 days from the bill of lading date.

19       59.    On or about August 22, 2014, Moneual purportedly shipped the goods

20  called for in the Fourth Set of Purchase Orders to the location specified by the

21  purchaser in Hong Kong.  Moneual sent an invoice to ASI Computer for

22  $11,085,600.  The invoices that Moneual issued to ASI for the Fourth Set of

23  Purchase Orders listed Moneual as the seller, ASI (HK) as the consignee and notify

24  party, and ASI Computer in Fremont, California as the buyer.  HS Park, identified

25  in the invoices as CEO of Moneual, signed the invoices.

26       60.    Moneual submitted to KEXIM the purchase orders and the attendant

27  packing lists, commercial invoices, and domestic shipment waybills as part of its

28  application to sell the export receivables due from ASI under the Fourth Set of

Purchase Orders.  The application to sell the receivables was reviewed and approved by KEXIM's STF.  The supporting documents on their face did not give any indication of the underlying fraudulent scheme.  At this time, however, ASI undoubtedly knew that KEXIM was relying on the genuineness of its purchase orders to factor Moneual's receivables given in December 2013 as well as sometime in 2014, ASI received notifications from Moneual that KEXIM was factoring ASI receivables, and on June 16, 2014, ASI paid KEXIM for the First Set of Purchase Orders.  Nevertheless, ASI did not inform KEXIM that the Fourth Set of Purchase Orders was bogus and that the Individual Defendants had received significant kickbacks for ASI's participation in Moneual's fraudulent circular transactions.  On or about September 24, 2014, pursuant to the EFA, KEXIM purchased Moneual's purported account receivable from ASI Computer for the invoices pertaining to the Fourth Set of Purchase Orders.

61.     Payment for the goods represented by the Fourth Set of Purchase Orders was due on February 18, 2015.  ASI Computer defaulted on that payment and KEXIM has never received payment for the money it advanced on the Fourth Set of Purchase Orders.

62.     Each purported purchase order in the First through Fourth Sets of Purchase Orders was signed by defendant Frances Chou as Director of ASI Computer.  ASI has never contested that it issued any of the 36 purchase orders.

63.     The Hong Kong address given for the consignees in the Third and Fourth Sets of Purchase Orders was bogus.  A company unrelated to ASI was located at that address.  At the time that it advanced funds to Moneual on the Third and Fourth Sets of Purchase Orders, KEXIM did not know that neither ASI Computer, nor ASI Corp., nor any affiliate of either defendant maintained a business at that Hong Kong address.

64.     The price of the HTPCs that ASI Computer purportedly bought from Moneual was vastly inflated.  Moneual purported to charge ASI $2,980 per unit,

1   and that amount was stated in the invoices on which KEXIM advanced the funds to

2   Moneual.  However, KEXIM is informed and believes and on that basis alleges that

3   in fact the HTPCs were junk:  old, defective items of obsolescent technology worth,

4   according to the Korean authorities, less than $8 per unit – a fraction of a percent of

5   the amount that Moneual billed to ASI Computer and that KEXIM advanced to

6   Moneual.

7   **ASI Fails to Pay Its Invoices Relating to the Second, Third, and Fourth Sets of**

8   **Purchase Orders**

9   65.     By July 2014, KEXIM had been repaid for its advance against the First

10   Set of Purchase Orders, but the Second and Third Sets of Purchase Orders remained

11   open.  KEXIM had approximately $29 million in outstanding advances to Moneual

12   against its invoices to ASI Computer for those orders.  KEXIM then inquired of

13   ASI Computer via KEXIM's contact at Moneual whether ASI Computer was in fact

14   in a business relationship with Moneual and whether ASI Computer had issued

15   purchase orders for Moneual products.

16   66.     On or about July 13, 2014, defendant Bill Chen, ASI Computer's Vice

17   President of Finance, responded to KEXIM's inquiry.  Bill Chen sent a letter to

18   KEXIM from his ASI email address affirming that Moneual was "one of [ASI

19   Computer's] most significant supplier[s]" and confirming that ASI Computer had a

20   number of pending purchase orders with Moneual.  In that same letter, ASI

21   Computer expressly affirmed the authority of Frances Chou to enter into the

22   transactions with Moneual.  Bill Chen, an officer of ASI Computer, wrote:  "In

23   regards to the business with Moneual Inc., if signed and confirmed by Frances

24   Chou(mail : franceschou@asipartner.com.hk) who is our director, all necessary

25   documentation and other follow-up actions are totally valid."

26   67.     Bill Chen's July 13, 2014 letter was intended to, and did, perpetuate

27   the false implication, and deceive KEXIM into believing, that ASI and Moneual

28   were engaged in a legitimate business relationship.  In reliance on Bill Chen's

- 20 -

representations in his July 13, 2014 letter, KEXIM purchased Moneual's purported account receivable from ASI Computer for the invoices pertaining to the Fourth Set of Purchase Orders.

68.     In or about October 2014, Moneual filed for receivership in Korea, owing in excess of $500 million to its lenders, including KEXIM.  Thereafter, on or about October 23, 2014, KEXIM wrote to ASI to remind ASI Computer of its obligation to pay for the receivables that KEXIM had purchased from Moneual. KEXIM's letter listed 28 open invoices, due on various dates from December 9, 2014 through February 18, 2015, corresponding to the 28 purported purchase orders in the Second through Fourth Sets of Purchase Orders.  ASI Computer's total outstanding obligation was $39,991,600.  ASI did not respond to KEXIM's letter.

69.     Because of ASI's failure to respond to KEXIM's October 23, 2014 letter, JH Lee, a KEXIM employee, travelled from Korea to California.  On or about October 27, 2014, he visited ASI's offices in Fremont, California to evaluate the export transactions between Moneual and ASI Computer and to reconfirm the validity of the purported purchase orders.  On that date, JH Lee attempted to reach both defendants Bill Chen and Frances Chou, but was unable to meet or even locate them.

70.     JH Lee then met with defendant Henry Chen, ASI's Vice President of Business Development, in ASI's offices in Fremont.  In that meeting, on or about October 27, 2014, Henry Chen confirmed that Bill Chen was a Director of ASI and that Frances Chou was ASI's "procurement officer" in Asia.  In a later telephone conversation with JH Lee on the same day, Henry Chen confirmed that the purported purchase orders signed by Frances Chou had been issued by ASI Computer and were "open," meaning not yet filled.  Henry Chen again confirmed, in an email sent to JH Lee on October 29, 2014, that the purported purchase orders were authentic and open.

71.     KEXIM made two further requests to ASI for payment on the receivables, on or about November 25, 2014 and December 12, 2014, again listing the 28 open invoices totaling $39,991,600.  On or about December 15, 2014, JH Lee had a telephone conversation with defendant Henry Chen regarding the status of ASI Computer's orders and payment.  In that conversation, Henry Chen again confirmed that defendant Frances Chou was ASI Computer's authorized agent with respect to the Moneual transactions, this time characterizing her as ASI Computer's "special contractor."

72.     On or about December 16, 2014, defendant Henry Chen followed up on the telephone conversation and wrote to JH Lee, stating that ASI Computer had not received the goods specified in the purported purchase orders.  Henry Chen did not deny the validity of the purported purchase orders.

73.     Defendant Henry Chen's December 16, 2014 correspondence to KEXIM claimed (as ASI Computer's justification for refusing to pay the pending invoices) that ASI Computer had never received a shipment of goods under the Second, Third, or Fourth Set of Purchase Orders and that there was not even a delivery schedule set for those purported purchase orders.  However, ASI Computer had issued the Fourth Set of Purchase Orders, for over $11 million, in August 2014, after paying in full for the First Set of Purchase Orders and at a time when the Second and Third Sets of Purchase Orders had been outstanding for nearly four months.  No business in ASI Computer's position would have issued new purchase orders for over $11 million to a supplier that was months behind in the delivery of previous orders unless it intended to deceive KEXIM into providing financing to Moneual for transactions that did not exist.

74.     Either Henry Chen falsely stated to KEXIM that ASI Computer had not received the goods from the Second, Third, and Fourth Set of Purchase Orders, in which case ASI Computer's failure to pay for the invoices pertaining to those orders evidences its participation in the scheme to defraud KEXIM; or the

- 22 -

statement was true, in which case ASI Computer's issuance of the Fourth Set of Purchase Orders evidences its participation in the scheme to defraud KEXIM.

75.     ASI Computer has never paid any of the invoices pertaining to the Second, Third, or Fourth Sets of Purchase Orders.  KEXIM has not received payment for the purported receivables that it factored for Moneual pertaining to those invoices, in the total principal sum in default of $39,991,600.

**ASI and the Individual Defendants' Participation in Moneual's Fraud**

76.     In late 2014, the Korean Customs Service conducted an investigation of Moneual's activities and prepared an internal investigation report.  On or about January 23, 2015, the Seoul district prosecutor's office indicted HS Park and other Moneual employees.  The indictment charged that those individuals had caused Moneual to execute large-scale fraud schemes using circular transactions.  The indictment further charged that the price of Moneual's HTPCs was greatly exaggerated, at $2,980 per unit when in fact they were only worth, according to the Korean authorities, approximately $8 per unit.  The indictment also detailed how Moneual's foreign importers such as ASI provided Moneual with purchase order numbers to enable Moneual executives to generate false and fraudulent purchase orders, which Moneual then used to obtain financing from at least ten banks, including KEXIM.

77.     In reliance on the purchase orders from Moneual's foreign importers, KEXIM believed it was purchasing valid export receivables, when in fact, it was providing Moneual with loans and advances based on bogus purchase orders that ASI helped Moneual create.

78.     KEXIM is informed and believes and on that basis alleges that ASI and the Individual Defendants knew about Moneual's scheme to defraud its lenders and agreed to assist Moneual in perpetrating that scheme.  Making these circular payments enabled the participants to deceive the banks, including KEXIM, and to prolong the fraudulent scheme.

- 23 -

79.     While ASI's export-import relationship with ASI may have started as early as 2006, on January 1, 2007, ASI formally contracted to distribute Moneual's products under the Distribution Agreement.  Defendant Christine Liang, in her capacity as President of ASI, executed the Distribution Agreement.  Accordingly, starting 2007, defendant Christine Liang expressly agreed to and had knowledge of ASI's transactions with Moneual.  Notably, defendant Christine Liang did not review or conduct any due diligence on Moneual's financial condition or the value of HTPCs prior to or at any point after the execution of the Distribution Agreement.

80.     Likewise, defendant Henry Chen, whose responsibilities as Vice President of Business Development included, among other things, overseeing new business development with customers and vendors and product management, did not review or conduct any due diligence on Moneual's financial condition or the value of the HTPCs prior to or at any point after the execution of the Distribution Agreement.

81.     Notwithstanding a complete lack of financial or product due diligence by defendants Christine Liang and Henry Chen, over the next seven years, ASI proceeded to purchase and sell products manufactured by Moneual at vastly inflated prices and process payments to bank accounts instructed by Moneual.  ASI did not inspect or examine the products it purchased from Moneual before they were sold to its purported customers.  All of ASI's purported customers were arranged by Moneual, and ASI did not perform any independent due diligence on their financial condition or creditworthiness prior to opening ASI customer accounts for them. KEXIM is informed and believes and on that basis alleges that none of the foregoing would have occurred unless ASI was an active participant in Moneual's fraudulent scheme.

82.     From 2010 to 2014, ASI's transactions with Moneual exceeded $1.2 billion in the aggregate.  If ASI's dealings with intermediary distributors who

1   purchased products from Moneual and sold them to ASI are included, the value of

2   ASI's fraudulent transactions would significantly increase.

3       83.    Defendant Frances Chou, on behalf of ASI, prepared and emailed

4   fraudulent purchase orders to Moneual or emailed ASI purchase order numbers

5   accessed from ASI's purchase order system (including the ASI purchase order

6   numbers for the First, Second, Third, and Fourth Sets of Purchase Orders) to

7   Moneual's Vice President, Chul-wook Shin, so that he could create fraudulent

8   purchase orders.  Defendant Henry Chen supervised the work performed by Frances

9   Chou on behalf of ASI.  Defendant Henry Chen, who was authorized to release

10  purchase order numbers from ASI's purchase order system, approved the release of

11  such order numbers (including the ASI purchase order numbers for the First,

12  Second, Third, and Fourth Sets of Purchase Orders) to Moneual.

13      84.    Moneual then submitted the fraudulent purchase orders, along with

14  fraudulent invoices and shipping documents, to financial institutions, including

15  KEXIM, to sell them export receivables based on these documents. Si-young Park

16  and/or Chang-il Choi, two Moneual employees, would tell Chul-wook Shin how

17  many purchase orders Moneual needed in light of previously-sold export

18  receivables that were approaching maturity.

19      85.    When ASI first became involved in the fraud scheme, Moneual

20  shipped the HTPCs to ASI Computer or ASI (HK) starting in 2012, which then sold

21  the HTPCs to Polaris Media Research Inc. and Polaris Media Research Holding

22  Limited (together, "**Polaris**"), paper companies that HS Park established in the US

23  and Hong Kong, respectively.  Polaris then sold the HTPCs to PK Paradigms,

24  another paper company set up by HS Park.  When the payment dates for the export

25  receivables approached, HS Park transferred money to PK Paradigms disguised as

26  payment for manufacturing supplies and parts for new products that Moneual was

27  importing into Korea, when Moneual was actually bringing back the very HTPCs it

28  had exported.  In fact, the HTPCs may not even have physically moved; the transfer

1   of their ownership may only have taken place on paper.  Making these circular

2   payments enabled the participants to continue to deceive the banks, including

3   KEXIM, and to prolong the fraudulent scheme.

4        86.    The money from the advances Moneual received from financial

5   institutions, including KEXIM, was then transferred in reverse to the supposed flow

6   of the HTPCs (*i.e.*, Moneual → PK Paradigms → Polaris → ASI Computer / ASI

7   (HK)), to allow ASI Computer or ASI(HK), as the case may be, to make payments

8   to financial institutions for the export receivables.  ASI's purchase orders provided

9   for payment by ASI within 180 days of shipment.  After shipping or purportedly

10  shipping the goods, Moneual would sell the export receivables to financial

11  institutions, including KEXIM, in exchange for an advance of funds.  When a set of

12  export receivables would become due, Moneual would transfer funds from previous

13  bank advances to PK Paradigms, purportedly for the supplies and parts it was

14  purchasing from PK Paradigms.  PK Paradigms would then transfer the funds to

15  Polaris, purportedly for the purchase of HTPCs.  Polaris, as ASI's purported

16  customer, would then transfer funds to ASI Computer or ASI (HK), as the case may

17  be, who would use the funds to pay the financial institution for the export

18  receivables they had purchased as instructed by Moneual employees and agents

19  such as Jennifer Ahn, HS Park's relative.

20       87.    Later, the circular transactions were diversified by enlisting additional

21  exporters and paper companies to ward off suspicion of the fraud scheme.  Moneual

22  would sell the HTPCs to ASI Computer or ASI (HK), and at times also to CBMIE,

23  China North Wanxing International Corp. ("**Wanxing**") and KT Networks Corp.

24  ("**KTN**"), who would in turn sell the same products to ASI Computer or ASI (HK).

25  Moneual would sometimes use Dynazen HK., Ltd. ("**Dynazen**") and Zalman Tech

26  Co., Ltd. ("**Zalman**"), rather than itself, to export goods to ASI, either directly, or

27  through one of the aforementioned intermediaries – CBMIE, Wanxing or KTN.

28

- 26 -

SECOND AMENDED COMPLAINT

88.    ASI Computer or ASI (HK), having purportedly "collected" the HTPCs from Moneual, Dynazen, Zalman, CNBM, Wanxing, or KTN, would sell the same HTPCs to various Hong Kong-based paper companies that were created or controlled by HS Park, such as:  (i) Polaris, (ii) Worldwide Excellence Limited ("**Worldwide**"), (iii) Noble Link Limited ("**Noble Link**"), (iv) Prime Nation Limited ("**Prime Nation**"), (v) Multi Way Electronics Ltd ("**Multi Way**"), (vi) Pioneer Rich Group Limited ("**Pioneer**"), and (vii) Dragon Wisdom Industrial Limited ("**Dragon Wisdom**").  KEXIM is informed and believes and on that basis alleges that these paper companies were used to launder funds for the fraudulent HTPC transactions, and to deceive banks (including KEXIM), accounting firms, and related agencies into believing that Moneual transactions were legitimate.

89.    The above-mentioned paper companies, such as Worldwide or Dragon Wisdom, would sell the HTPCs purchased from ASI Computer or ASI (HK) to Brilliant Cosmos Limited ("**Brilliant Cosmos**"), another company used by HS Park to circulate the HTPCs.  KEXIM is informed and believes and on that basis alleges that a separate company called Advance Global Group Pte. Ltd. ("**Advance Global**") acted in a role similar to Brilliant Cosmos.  Brilliant Cosmos would sell the HTPCs to either Amerex Corporation Limited ("**Amerex**"), another Hong Kong-based paper company controlled by HS Park, or PK Paradigms, which exported the same products back to Moneual in Korea.

90.    KEXIM is informed and believes and on that basis alleges that the funds flowed in the opposite direction of the movement of the goods, so that money was wired from (i) Moneual, Dynazen, or Zalman to (ii) Amerex or PK Paradigms to (iii) Advance Global or Brilliant Cosmos to (iv) Polaris, Worldwide, Noble Link, Prime Nation, Multi Way, Pioneer, or Dragon Wisdom to (v) ASI Computer or ASI (HK) to (vi) the banks that factored Moneual's receivables, either directly from ASI Computer or ASI (HK), or through CBMIE, Wanxing, or KTN.  However, it appears that at times, certain paper companies acted in different capacities,

1  switching from customer to supplier, likely to vary the transactions and avoid

2  suspicion.

3      91.    The following is a diagram of the general funds flow that KEXIM is

4  informed and believes and on that basis alleges occurred in the circular transactions

5  involving ASI:



22      92.    Defendant Frances Chou conspired with and assisted Moneual in

23  creating company websites for several paper companies, including Dragon

24  Wisdom.  KEXIM is informed and believes and on that basis alleges that these

25  websites were fabricated to give the appearance that these paper companies were

26  legitimate businesses and not in fact paper companies formed solely to participate

27  in Moneual's fraudulent scheme.

28

- 28 -

93.     KEXIM is informed and believes and on that basis alleges that defendant Bill Chen, as Vice President of Finance, personally approved all of ASI's Moneual-related payments.

94.     Well before KEXIM began its factoring relationship with ASI, Moneual had already requested other banks in Korea such as Industrial Bank of Korea, Nonghyup Bank, KEB Hana Bank, and Kookmin Bank, among others, to factor numerous receivables from ASI.  KEXIM is informed and believes and on that basis alleges that at some point between 2006 and 2010, and continuing until the scheme was uncovered in 2014, ASI issued fraudulent purchase orders for the purported purchase of HTPCs and other goods manufactured by Moneual so that Moneual could obtain loans from Korean banks and other financial institutions by selling the export receivables backed by the fraudulent purchase order.  By the time KEXIM began factoring Moneual's receivables from ASI, ASI was well accustomed to Moneual's factoring arrangements and knew or had reason to expect that Moneual was transmitting its purchase orders to banks in Korea to receive factoring advances.  ASI had already received many standing payment instructions from Moneual for each set of export receivables Moneual sold to the banks, informing ASI that Moneual had designated a bank as its "payee and assignee" for certain "sales contracts" – identified by purchase order numbers – and instructing it to pay such bank directly when payment on its invoices came due.  Because ASI knew that Moneual was obtaining advances on its ASI receivables from multiple financial institutions, it could reasonably expect that Moneual would seek export trade financing for its ASI receivables from other financial institutions, including KEXIM.  ASI knew or should have known that Korean banks, including KEXIM, would reasonably rely on the purchase orders issued by it in agreeing to purchase Moneual's export receivables from ASI.

95.     ASI's bank records show that between 2010 and 2014, ASI sent Korean banks countless wire transfers amounting to more than a billion dollars for

- 29 -

1   payment on the invoices pertaining to various sets of fraudulent purchase orders.

2   Due to the nature of Moneual's fraudulent circular transactions, even when ASI did

3   receive goods from Moneual, the wire transfers did not reflect payment for genuine

4   transactions.  Based on ASI and the Individual Defendants' lack of due diligence on

5   any aspect of ASI's transactions with Moneual, whether with respect to Moneual,

6   the paper companies acting as customers for Moneual products, or the products

7   themselves, ASI knew, and in fact did not care, that its transactions with Moneual

8   were not genuine transactions.  Defendant Christine Liang, who executed the

9   Distribution Agreement with Moneual in 2007, authorized and approved the

10  fraudulent transactions with Moneual.  Especially in light of the fact that ASI was

11  wiring hundreds of millions of dollars on an annual basis, it is inconceivable that

12  Christine Liang did not know of the fraudulent nature of ASI's transactions with

13  Moneual.

14          96.     When ASI received the notification in December 2013 from Moneual

15  informing it that KEXIM would be factoring ASI's receivables, ASI and the

16  Individual Defendants, as the executives and agents of ASI, should have disclosed

17  to KEXIM that ASI's purchase orders did not represent genuine transactions.  In

18  particular, defendant Henry Chen, who was responsible for authorizing and

19  releasing the purchase orders to Moneual, and defendant Frances Chou, who was

20  responsible for transmitting the purchase order numbers to Moneual, knew that the

21  purchase order numbers would be used to sell fraudulent receivables to KEXIM but

22  failed to disclose such fact.

23          97.     Further, when ASI arranged for ASI (HK) to make a wire transfer to

24  KEXIM for payment on the First Set of Purchase Orders, ASI and the Individual

25  Defendants, and in particular defendant Bill Chen who was ASI's Vice President of

26  Finance at the time, knew that this wire transfer did not represent payment for

27  genuine transactions.  Yet neither ASI nor the Individual Defendants disclosed that

28  the wire transfers represented payments for circular transactions, or in the

1   alternative that ASI was not receiving any goods in exchange for the wire transfer

2   ASI (HK) made to KEXIM.  ASI made payment on the First Set of Purchase Orders

3   to create the illusion that its purchase orders represented genuine transactions, in

4   order to deceive KEXIM into continuing to finance Moneual's exports to ASI under

5   the Second, Third, and Fourth Sets of Purchase Orders, thereby prolonging the

6   fraudulent scheme.

7          98.    The Korean authorities' investigation also revealed that as part of

8   Moneual's scheme to defraud its lenders by obtaining money from them based on

9   bogus export receivables from foreign importers, Moneual bribed executives and

10  employees of those foreign importers, including ASI, by paying kickbacks to those

11  persons, which HS Park called "commissions."

12         99.    KEXIM is informed and believes and on that basis alleges that

13  Moneual calculated the "commissions" it paid to ASI by applying an agreed-upon

14  percentage to ASI's monthly purchase amount from Moneual, and later, to ASI's

15  quarterly or half-yearly purchase amount from Moneual.

16         100.   KEXIM is informed and believes and on that basis alleges that

17  beginning in 2008, Moneual paid ASI a 1.5 percent commission.  However, upon

18  information and belief, in 2012, at ASI's request, Moneual reduced ASI's

19  "commission" and began to pay personal "commissions," calculated in the same

20  fashion, directly (or through intermediaries or family members, or to offshore

21  accounts) to officers, employees and agents of ASI including, among others, the

22  Individual Defendants.

23         101.   HS Park testified in the Korean criminal proceedings that the

24  Individual Defendants were aware of the fraudulent scheme, and that they

25  demanded, received, and accepted millions in bribes from Moneual in return for

26  their active participation in the fraudulent scheme.  Between 2012 and 2014,

27  defendants Bill Chen and Frances Chou emailed Moneual personnel, including HS

28  Park, numerous times to request that Moneual pay them personal "commissions."

- 31 -

HS Park admitted that he remitted "commissions" to the Individual Defendants numerous times to keep the circular transactions going, which fact was further supported by testimony of other Moneual employees during the Korean criminal proceedings.  KEXIM is informed and believes and on that basis alleges that Moneual paid each of the Individual Defendants, and each of the Individual Defendants accepted, in excess of $1 million in kickbacks between 2012 and 2014.

102.   A ledger detailing Moneual's flow of funds for the circular transactions with ASI demonstrates that between 2012 and 2014, Moneual, through its paper companies, made multiple wire payments to the Individual Defendants or their family members or designated companies.  PK Paradigms was the primary paper company Moneual used to pay kickbacks to the Individual Defendants.  PK Paradigms's bank records support the kickbacks detailed in the ledger.  KEXIM is informed and believes and on that basis alleges that HS Park directed Jeff Kim, his high school friend who managed the bank accounts of HS Park's paper companies, to make the commission payments by wiring funds from PK Paradigms or other paper companies to the Individual Defendants' bank accounts or to bank accounts of companies they designated.

103.   KEXIM is informed and believes and on that basis alleges that the Individual Defendants also received payments in cash or cash equivalents from Moneual.  Based on the ledger and PK Paradigms's bank records, many of such payments appear to have been made from cash withdrawn from PK Paradigms's bank account.

104.   Kickbacks received by the Individual Defendants include the following:

        a.   Defendant Bill Chen and/or his designated company received kickbacks on at least the following occasions: April 10, 2013 ($40,000); July 8, 2013 ($60,000 and $129,500); October 4, 2013 ($64,655 and $50,000); January 15, 2014 ($100,000); and January

1    20, 2014 ($1,538,186).  KEXIM is informed and believes and on

2    that basis alleges that most of the foregoing payments were made to

3    him in cash in person during his many meetings with HS Park.

4       b.  Defendant Frances Chou and/or her designated relative received

5    wire transfers on at least the following occasions: October 10, 2012

6    ($48,000); November 2, 2012 ($35,158); November 30, 2012

7    (14,680); January 3, 2013 ($13,125); February 1, 2013 ($21,985);

8    March 4, 2013 ($110,958); April 3, 2013 ($22,878); May 3, 2013

9    ($22,460); June 4, 2013 ($20,930); June 27, 2013 ($518,120);

10   August 6, 2013 ($31,880); September 17, 2013 ($27,020); October

11   3, 2013 ($27,485); January 13, 2014 ($34,030); February 17, 2014

12   ($33,200); March 13, 2014 ($33,390); April 8, 2014 ($34,750); and

13   May 7, 2014 ($34,910).  PK Paradigms's bank records show that

14   some of the kickback payments were received by Mary Yeh, who

15   KEXIM is informed and believes and on that basis alleges received

16   the payments on behalf of Frances Chou.

17      c.  Defendants Henry Chen and Bill Chen received kickback payments

18   by wire transfer to an account in the name of THC Ltd. on at least

19   the following occasions: October 8, 2012 ($125,237); January 17,

20   2013 ($183,499); April 5, 2013 ($112,091); July 2, 2013

21   ($230,944); October 9, 2013 ($140,493); January 16, 2014

22   ($156,364); and February 26, 2014 ($200,000).  Both THC Ltd. and

23   PK Paradigms's bank records show that THC Ltd. received the

24   aforementioned payments from PK Paradigms.  Defendants Bill

25   Chen and Henry Chen are each 50 percent shareholders of THC

26   Ltd., which was incorporated in 2012.  At the time of incorporation,

27   THC Ltd. had a total paid-in capital of merely NTD$50,000 in

28   cash, which is less than $1,700 based on current exchange rates.

1     Under THC Ltd.'s articles of association, profits after tax and

2     statutory reserve are distributed to each shareholder in accordance

3     with the ratio of each shareholder's capital contribution.  KEXIM is

4     informed and believes and on that basis alleges that THC Ltd. was a

5     paper company established by defendants Bill Chen and Henry

6     Chen to receive kickbacks from Moneual for their assistance in its

7     fraud scheme.

8    d. Defendant Christine Liang and/or her paper company received wire

9     transfers on at least the following occasions: July 16, 2012

10     ($996,335); October 15, 2012 ($450,000); October 19, 2012

11     ($457,419); January 17, 2013 ($575,801); April 23, 2013

12     ($199,613); July 12, 2013 ($1,719,414); October 18, 2013

13     ($1,142,958); January 20, 2014 ($1,538,166); May 2, 2014

14     ($1,166,152); July 28, 2014 ($1,515,594); and August 1, 2014

15     ($25,967).   KEXIM is informed and believes and on that basis

16     alleges that some or all of the kickback payments Christine Liang

17     received were wired to an account in the name of Berwick

18     Resources Ltd, a Taiwanese company, which bank account was

19     controlled by Tai-Ying Chu, Christine Liang's sister, and Fang-

20     Chiang Lee, Christine Liang's nephew.  The bank records of

21     Berwick Resources Ltd., PK Paradigms, and Amerex show that

22     Berwick Resources Ltd. received the aforementioned payments

23     from PK Paradigms and Amerex.

24   105. Based on email communications between the Individual Defendants

25 and Moneual agents and employees, including HS Park, the Individual Defendants

26 met with HS Park multiple times over the course of ASI's fraudulent transactions

27 with Moneual.  KEXIM is informed and believes and on that basis alleges that HS

28

- 34 -

Park and one or more of the Individual Defendants met on at least the following occasions:

    a.  HS Park and Frances Chou met on or about January 23-25, 2008, in Taipei, Taiwan.

    b.  HS Park and Frances Chou met on or about August 17-20, 2009, in Seoul, Korea.

    c.  HS Park and defendants Henry Chen, Bill Chen, and Frances Chou met on or about November 24, 2009, in Northern California.

    d.  HS Park, Henry Chen and/or Bill Chen met on or about May 28-30, 2010, in Seoul, Korea.

    e.  HS Park and Frances Chou met on or about February 8-9, 2011, in Hong Kong.

    f.  HS Park, Henry Chen and/or Bill Chen met on or about March 21, 2011, in Hong Kong.

    g.  HS Park, Henry Chen and/or Frances Chou met on or about June 1-3, 2011, in Taipei, Taiwan.

    h.  HS Park and Bill Chen met during the week of December 12, 2011, in Northern California.

    i.  HS Park and Christine Liang met on May 2, 2012, in Fremont, California.

    j.  HS Park, Christine Liang, Henry Chen, and/or Frances Chou met on or about June 4, 2012, in Taipei, Taiwan.

    k.  HS Park and Bill Chen met on or about July 4-6, 2012, in Hong Kong.

    l.  HS Park, Bill Chen and/or Frances Chou met on or about October 25, 2012, in Northern California.

    m.  HS Park, Henry Chen, and Frances Chou met on or about January 7, 2013.

- 35 -

n. Frances Chou and Moneual employees including Young-keun Choi, Chul-wook Shin, Chang-il Choi, and/or Si-young Park in June 2014, in Hong Kong.

106.  KEXIM is informed and believes and on that basis alleges that during some of these meetings, ASI, the Individual Defendants, Moneual, and HS Park discussed and negotiated the details of ASI and Moneual's circular transactions and reached an agreement to enter into fraudulent transactions designed to defraud banks, including KEXIM, financing Moneual's export receivables.  KEXIM is informed and believes and on that basis alleges that during some of these meetings, HS Park also paid kickbacks to some or all of the Individual Defendants in cash or cash equivalents.

107.  ASI's participation in the fraudulent scheme to defraud KEXIM was systemic and institutional, involving multiple officers, employees, and agents of the company who participated in laundering money and creating and concealing fraudulent transactions with Moneual.  The scheme was condoned at the highest levels of the company by virtue of the involvement of ASI's most senior officers including its President, Christine Liang, and its Vice Presidents Bill Chen and Henry Chen.

108.  HS Park was convicted in the Seoul Central District Court of defrauding ten Korean banks, including KEXIM, of over $3 billion between 2007 and 2014 based on loans that Moneual received for fraudulent export contracts.  On October 16, 2015, HS Park was sentenced to 15 years in prison, and fines and forfeitures of approximately $35 million.  He is currently serving his sentence.

109.  KEXIM is informed and believes and on that basis alleges that other employees or executives of Moneual have also been convicted of fraud based on their participation in the fraudulent schemes of Moneual and HS Park to defraud Moneual's lenders.

AMERICAS 94066627 (2K)

## FIRST CLAIM FOR RELIEF

### (Fraud)

### (Against All Defendants)

110.   KEXIM realleges the allegations of paragraphs 1 through 109 and incorporates those allegations here as if fully set forth.

111.   While engaging in and carrying out the course of conduct alleged above, Moneual and ASI made numerous misrepresentations of material fact to KEXIM, and/or concealed from or failed to disclose to KEXIM facts that would have been material to KEXIM's decision to engage in its factoring relationship with Moneual, and/or that were necessary to make the statements of Moneual and ASI not misleading.

112.   Based on these misrepresentations, KEXIM agreed to purchase Moneual's right to payment from ASI for the export receivables described herein. Shortly after KEXIM entered into the initial EFA with Moneual in December 2013, Moneual sent ASI Computer a notification informing ASI Computer that it should make payments on Moneual's invoices directly to KEXIM.  This assignment was acknowledged by Frances Chou as "Director" on behalf of ASI.  An essentially identical notification of assignment was again acknowledged by Frances Chou as "Director" on behalf of ASI in 2014.  These assignments established a commercial relationship between ASI and KEXIM, and ASI then transacted directly with KEXIM by making payment to KEXIM for the First Set of Purchase Orders as described herein, pursuant to these assignments.

113.   ASI's misrepresentations, concealments, and failures to disclose included, among others, the following:

        a.   ASI issued multiple sets of purchase orders that Moneual used to secure advances from KEXIM even though Moneual was either exporting recycled products or only transferring ownership of the products on paper without physical shipment to ASI. ASI would not

1    have issued those purchase orders unless it intended to deceive

2    KEXIM into providing financing to Moneual for nonexistent

3    transactions.  Prior to KEXIM's factoring arrangements with

4    Moneual, ASI knew or had reason to expect that Moneual was

5    transmitting its purchase orders to banks because since at least

6    2010, ASI had been receiving numerous standing payment

7    instructions from Moneual alerting ASI that Moneual was assigning

8    the export receivables, or "sales contracts" represented by the

9    purchase orders and invoices, to various Korean banks.  Also, ASI

10   had acknowledged and consented to those assignments of export

11   receivables backed by the purchase orders.  ASI knew or should

12   have known that since at least 2010, banks were reasonably relying

13   on the purchase orders in agreeing to purchase ASI receivables

14   under export factoring agreements with Moneual.  Because ASI

15   knew that Moneual was obtaining advances on its ASI receivables

16   from multiple financial institutions, it could reasonably expect that

17   Moneual would seek export trade financing for its ASI receivables

18   from other financial institutions, including KEXIM.  ASI knew that

19   KEXIM was relying on the genuineness of its purchase orders

20   when it received the December 2013 notification from Moneual

21   that its receivables were being assigned to KEXIM and that it

22   should make payments on Moneual's invoices directly to KEXIM.

23   Nevertheless, ASI did not inform KEXIM that its receipt of the

24   HTPCs were part of a fraudulent scheme involving circular

25   transactions, or in the alternative that it was no longer receiving the

26   goods described in the purchase orders it issued or assisted

27   Moneual in issuing or fabricating;

28

- 38 -

b.  The Supply Agreement required ASI Corp. to purchase an unrealistically high quantity of goods from Moneual – $200 million in the first year of the Supply Agreement and $400 million in the second – that was either impossible for ASI Corp. to meet or would have been onerous given the size and condition of ASI Corp.'s business;

c.  The HTPCs that ASI Computer was purportedly buying from Moneual were priced at an amount nearly 400 times their actual market value.  No business of the size, breadth, history, and experience of ASI could legitimately have judged that the products were worth the nearly $3,000 per unit that ASI Computer was supposedly paying for them, and no such business would have bought the products at that inflated price, unless it intended to create the illusion of extensive, profitable, high-value commerce between it and its supplier for the purpose of defrauding lenders into supporting the transactions;

d.  In May 2014, KS Kang of Moneual contacted KEXIM requesting that it reevaluate ASI's creditworthiness in connection with Moneual's application for factoring its export receivables due from ASI.  KS Kang informed KEXIM that ASI had provided HS Park an updated D&B credit rating report, and that ASI's new ratings had improved.  KEXIM had previously alerted Moneual that it could not proceed with its factoring application because ASI's credit ratings did not meeting internal requirements.  KEXIM reviewed D&B's new credit rating on ASI and relied on such information to enter into its factoring agreement with Moneual. ASI knew that KEXIM would consider its credit rating in deciding whether to factor Moneual's receivables due from ASI.  ASI also

knew that its credit rating was based on false information – its
financial information, which D&B used to assess its credit rating,
was based on vastly inflated sales resulting from hundreds of
millions dollars' worth of fraudulent transactions with Moneual.
The fraudulent transactions made ASI appear to be a much larger
distributor than it would be if it was evaluated purely on its
legitimate business transactions;

e. On November 19 and 22, 2013, Bill Chen sent ASI's 2010-2012
balance sheets, income statements, and auditor's cover letter and
opinion to KEXIM.  ASI knew that KEXIM would be reviewing
ASI's financial statements as part of its due diligence on ASI's
creditworthiness in connection with KEXIM's review of Moneual's
factoring application.  The financial statements sent by Bill Chen
incorporated voluminous fictitious and/or fraudulent transactions
between ASI and Moneual, thereby significantly inflating ASI's
income statement figures.  ASI knew that its financial statements
were inaccurate and gave the false appearance that its distribution
business was larger than reality.  ASI and the Individual Defendants
did not disclose this fact to KEXIM, and KEXIM had no basis to
suspect that ASI's financial statements were inflated.  KEXIM
reasonably relied on the financial statements in approving
Moneual's application for KEXIM to factor its receivables due
from ASI;

f. Moneual provided KEXIM with the November 20, 2013 KSURE
certification document which purported to show a business
relationship between Moneual and ASI Computer involving
payment in full of tens of millions of dollars per year, figures which

- 40 -

1   were false and known to Moneual to be false when provided to

2   KEXIM;

3   g.   ASI Computer issued the Second and Third Sets of Purchase

4   Orders in April and May 2014, well after it had purportedly

5   received the goods from its First Set of Purchase Orders (in or

6   about December 2013) and at a time when it knew or should have

7   known that the HTPCs were wildly overpriced relative to their

8   actual worth.  ASI Computer would not have issued those purchase

9   orders, in the amount of nearly $30 million, unless it intended to

10   deceive KEXIM into providing financing to Moneual for

11   nonexistent transactions;

12   h.   In June 2014, ASI sent to KEXIM by wire transfer, from an

13   account of its Hong Kong affiliate, approximately $12 million in

14   payment for the invoices pertaining to the First Set of Purchase

15   Orders.  Due to the nature of Moneual's fraudulent scheme, based

16   on circular transactions, Moneual may never have actually

17   physically shipped the HTPCs to ASI Computer.  ASI knew that

18   the wire transfer did not represent payment for genuine

19   transactions, and it knew that KEXIM was receiving the payment

20   because ASI (HK), its affiliate, transmitted them directly to the

21   banks.  ASI made its June 2014 payment for the purpose of creating

22   for KEXIM the illusion that the First Set of Purchase Orders

23   represented a genuine transaction, in order to deceive KEXIM into

24   continuing to finance Moneual's exports to ASI Computer, thereby

25   prolonging the fraudulent scheme;

26   i.   On or about July 13, 2014, Bill Chen, an officer of ASI Computer,

27   stated in writing to KEXIM that Moneual was "one of [ASI's] most

28

- 41 -

significant supplier[s]" and represented that ASI Computer had
numerous pending purchase orders with Moneual;

j. In that same letter, Bill Chen, an officer of ASI Computer,
expressly confirmed that Frances Chou was a director of ASI
Computer, affirmed her authority to enter into the transactions with
Moneual represented by the purported purchase orders, and assured
KEXIM that documentation and follow-up actions in which she
was involved were "totally valid";

k. Henry Chen, an officer of ASI Computer, represented to KEXIM
on at least three occasions, in October and in December 2014, that
both Bill Chen and Frances Chou were directors, officers, or
authorized agents of ASI Computer, and did not disclose any limits
on the authority of either one with regard to the Moneual
transactions.

114.   Moneual and ASI made each of the misrepresentations set forth in
paragraphs 113(a)-(k) with knowledge of its falsity, and with the intent to deceive
KEXIM, by inducing KEXIM to advance millions of dollars to Moneual against
fraudulent receivables that ASI Computer had neither the intent, nor the ability, to
pay.

115.   The misrepresentations and deceit directed at KEXIM were known or
condoned at the highest levels of ASI's institutional structure.  ASI's most senior
officers and agents, including its President, Christine Liang; its Vice Presidents Bill
Chen and Henry Chen; and its agent and director, Frances Chou, participated in the
fraudulent scheme to defraud KEXIM, and conspired with and aided and abetted
Moneual to carry out the fraudulent scheme by, among other things, the following:

a. Defendant Christine Liang, the President of ASI, agreed to enter
into fraudulent transactions with Moneual when she executed the
Distribution Agreement in 2007, and in fact had no interest in

having any legitimate business relationship with Moneual as she performed no due diligence on the company or its products prior to or after the execution of the Distribution Agreement; met with HS Park in person on multiple occasions to collude on the fraud scheme to defraud banks, including KEXIM; reviewed and approved ASI's inflated financial statements that incorporated hundreds of millions of dollars' worth of fraudulent transactions with Moneual even though she knew or had reason to know that they would be shared with banks and credit agencies as part of their review of ASI's creditworthiness in connection with the banks' decision to factor Moneual's receivables due from ASI; and received kickbacks from Moneual in amounts that KEXIM is informed and believes exceeded $9 million, paid to the account of Berwick Resources Ltd. which she controlled through her family members;

b. Bill Chen, ASI's Vice President of Finance, participated in numerous communications and transactions with Moneual and its agents regarding transferring funds among ASI, Moneual, and multiple sham corporations set up by Moneual as part of the circular transactions that were the essence of the fraudulent scheme; colluded with Moneual and its agents to set up sham entities as customers or vendors of ASI as part of the circular transactions, to convey false information to KEXIM, and to conceal negative information from becoming publicly known; sent KEXIM as well as credit rating agencies whose ratings Bill Chen knew KEXIM would rely on in assessing ASI's creditworthiness, ASI's financial statements that had been vastly inflated by including hundreds of millions of dollars' worth of fraudulent transactions with Moneual,

- 43 -

and which financial statements he reviewed and approved and knew were false; requested kickbacks from Moneual personnel, including HS Park, for ASI and the Individual Defendants' participation in the fraud scheme; met with HS Park in person on multiple occasions to collude on the fraud scheme to defraud banks, including KEXIM; and received kickbacks from Moneual in amounts that KEXIM is informed and believes exceeded $1 million;

c. Henry Chen, ASI's Vice President of Business Development, communicated directly with agents of Moneual regarding submitting fraudulent purchase orders to Moneual and other entities regarding structuring the circular transactions that were the essence of the fraudulent scheme; released (with proper authority) ASI's purchase order numbers comprising the First, Second, Third, and Fourth Sets of Purchase Orders to Moneual with knowledge that these purchase order numbers would be used to create fictitious purchase orders used to sell fraudulent receivables to banks such as KEXIM; supervised defendant Frances Chou's material assistance to Moneual in the fraud scheme; met with HS Park in person on multiple occasions to collude on the fraud scheme to defraud banks, including KEXIM; and received kickbacks from Moneual in amounts that KEXIM is informed and believes exceeded $1 million;

d. Frances Chou, ASI's director and its employee or agent, provided material assistance to Moneual by creating sham entities to participate in the circular transactions, developing web pages for those sham entities to give them the appearance of genuine companies, and participating in or orchestrating the submission of

- 44 -

fraudulent purchase orders and the transfer of funds among ASI, Moneual, and multiple sham corporations set up by Moneual as part of the circular transactions that were the essence of the fraudulent scheme; met with HS Park in person on multiple occasions to collude on the fraud scheme to defraud banks, including KEXIM; and received kickbacks from Moneual in amounts that KEXIM is informed and believes exceeded $1 million.

116.   KEXIM relied on the representations of Moneual and ASI set forth above in determining, first, to enter into the EFA with Moneual for the ASI Computer receivables, and, second, to advance a total of approximately $52 million to Moneual against purported receivables which Moneual and ASI Computer knew to be fraudulent.  KEXIM would not have entered into the EFA, or advanced money thereunder to Moneual, if KEXIM had known that the purchase orders that ASI Computer issued for Moneual HTPCs were fraudulent or that Moneual was engaged in a massive scheme to defraud KEXIM and numerous other banks by conspiring with foreign importers such as ASI Computer to create the illusion that Moneual was exporting millions of dollars of goods in legitimate business transactions.

117.   KEXIM justifiably relied on the representations of Moneual and ASI in that KEXIM conducted a commercially reasonable investigation into the business of its customer Moneual and the creditworthiness of Moneual's customer ASI and reasonably determined, based on information which turned out to be false, that Moneual's business was legitimate and would support the factoring agreement for Moneual's receivables.  KEXIM also conducted a customary and market-standard review of the purchase orders and other documentation backing the export receivables, and justifiably relied on the statements made in those documents concerning the price, quantity ordered, and shipment of the goods.  Although those statements turned out to be false, their falsity could not be determined from the face

- 45 -

of the documents.  Further, from all external indications, ASI was a profitable, reputable company with over $1 billion in revenue and multiple locations worldwide that engaged in distributing the types of goods Moneual purported to be selling.  Given the size, breadth, history and experience of ASI in the relevant industry, KEXIM had no reason to doubt that the products were worth the nearly $3,000 per unit that ASI was supposedly paying for them.  Further, KEXIM received timely payment from ASI for the export receivables under the First Set of Purchase Orders.  Thus, KEXIM had no reason to suspect that ASI was engaged in a scheme to defraud it until after it had purchased additional receivables from Moneual and Korean authorities uncovered the fraudulent scheme.

118.   In addition to defrauding KEXIM directly by making the misrepresentations alleged above, the defendants rendered substantial assistance to HS Park and Moneual to enable them to carry out the scheme to defraud Moneual's lenders, including KEXIM.

119.   ASI rendered such assistance by, among other actions:

    a.   entering into the Supply Agreement with Moneual on unmeetable or onerous terms calling for the minimum purchase of hundreds of millions of dollars of Moneual products even though it was no longer receiving any products from Moneual when it entered into the Supply Agreement;

    b.   furnishing KEXIM and credit rating agencies with ASI's financial statements which were largely inflated to reflect the voluminous fictitious and/or fraudulent transactions between ASI and Moneual;

    c.   issuing purchase orders for nearly 18,000 units of HTPCs at enormously inflated prices relative to their true value, enabling Moneual to use those purported purchase orders to induce KEXIM to enter into the EFA, progressively raise Moneual's credit limit to

1    $40 million, and ultimately advance that sum to Moneual against
2    fraudulent receivables;

3    d.  paying KEXIM in respect of Moneual's purported receivable on the
4    First Set of Purchase Orders, thereby enabling Moneual to construct
5    and prolong its deceptive scheme;

6    e.  suffering or permitting their executives, officers, and employees to
7    receive millions of dollars in bribes in the form of kickbacks from
8    Moneual; and

9    f.  assuring KEXIM on multiple occasions that ASI Computer had a
10    genuine business relationship with Moneual, that the purported
11    purchase orders that ASI Computer issued for Moneual products
12    were authentic and authorized, and that actions taken by Frances
13    Chou were "totally valid," all as set forth more particularly above.

14    120.    The Individual Defendants rendered such assistance by, among other
15    actions:

16    a.  colluding with Moneual to set up sham entities to act as customers
17    or vendors of ASI for the purpose of facilitating the circular
18    transactions;

19    b.  preparing and/or approving ASI's financial statements which were
20    largely inflated to reflect the voluminous fictitious and/or
21    fraudulent transactions between ASI and Moneual and furnishing
22    such false financial statements to KEXIM and credit rating agencies
23    for credit analyses;

24    c.  submitting false and fraudulent purchase orders to Moneual and
25    other entities to create the appearance of legitimate transactions that
26    Moneual would use to obtain financing from KEXIM;

27    d.  directing or orchestrating the transfer of funds among ASI,
28    Moneual, and multiple sham corporations that constituted the

- 47 -

circular transactions that were the essence of the fraudulent scheme; and

e.  accepting bribes and kickbacks from Moneual amounting to millions of dollars in exchange for concealing the nature and extent of the massive fraudulent scheme.

121.   KEXIM is informed and believes and on that basis alleges that ASI, through their directors, officers, employees, and agents, including without limitation the Individual Defendants, and the Individual Defendants personally, had actual knowledge of the fraudulent scheme perpetrated against Moneual's lenders, including KEXIM, at the time that ASI and the Individual Defendants rendered each act substantially assisting Moneual and its executives, including HS Park, to carry out their fraudulent scheme.  Each of the defendants therefore aided and abetted Moneual and HS Park in the scheme to defraud KEXIM.

122.   KEXIM is informed and believes and on that basis alleges that ASI and the Individual Defendants shared with Moneual and its executives, including HS Park, a common plan or design to defraud Moneual's lenders, including KEXIM.  In furtherance of that common plan or design, ASI and the Individual Defendants conspired with Moneual and HS Park to defraud KEXIM by engaging in the acts and making the representations alleged above.  Each of the defendants is therefore liable to the same extent as Moneual and HS Park for the damages KEXIM sustained as a result of the scheme to defraud it.

123.   As a result of the foregoing misrepresentations, concealments, and nondisclosures made to KEXIM, and KEXIM's reliance thereon, KEXIM has been damaged in a minimum amount of $39,991,600, plus interest according to proof.

124.   KEXIM is informed and believes and on that basis alleges that ASI, through their officers, directors, or managing agents, each had advance knowledge of the unfitness of its employees and agents, and employed them with an intent to deceive and/or with a conscious disregard of the rights of others, including KEXIM,

- 48 -

1    and that each authorized and ratified the fraudulent conduct of its employees and

2    agents as alleged herein.  KEXIM is therefore entitled to exemplary damages

3    against ASI, in an amount sufficient to punish the defendants and deter similar

4    conduct in the future.

5         125.  By virtue of their actions as alleged herein, each of the Individual

6    Defendants has engaged in acts of malice and fraud directed at KEXIM.  KEXIM is

7    therefore entitled to exemplary damages against each Individual Defendant, in an

8    amount sufficient to punish the defendants and deter similar conduct in the future.

9                        **<u>SECOND CLAIM FOR RELIEF</u>**

10                        **(Negligent Misrepresentation)**

11             **(Against Defendants ASI Corp. and ASI Computer)**

12        126.  KEXIM realleges the allegations of paragraphs 1 through 125 and

13    incorporates those allegations here as if fully set forth.

14        127.  The statements and representations of Moneual and ASI as set forth

15    above were untrue.  Moneual and ASI made those statements and representations

16    with no reasonable ground for believing them to be true, and with the intent to

17    induce KEXIM to rely upon them.  KEXIM was unaware of the falsity of those

18    statements and representations, and justifiably relied on those statements and

19    representations in determining, first, to enter into the EFA with Moneual for the

20    ASI Computer receivables, and, second, to advance a total of approximately $52

21    million to Moneual against purported receivables which Moneual and ASI either

22    knew to be fraudulent or had no reasonable grounds to believe were genuine.

23        128.  As a proximate result of KEXIM's reliance on the truth of the

24    statements and representations of ASI, and their other acts and omissions as alleged

25    above, KEXIM has been damaged in a minimum amount of $39,991,600, plus

26    interest according to proof.

27

28

                                    - 49 -

### THIRD CLAIM FOR RELIEF

### (Negligent Supervision)

### (Against Defendants ASI Corp. and ASI Computer)

129.   KEXIM realleges the allegations of paragraphs 1 through 128 and incorporates those allegations here as if fully set forth.

130.   KEXIM is informed and believes and on that basis alleges that ASI negligently trained, managed, supervised, and retained their officers, employees and agents, including without limitation defendants Christine Liang, Frances Chou, Bill Chen, and Henry Chen, as to the performance of their job duties, including the formation of agreements with suppliers, the issuance of purchase orders, and communications with creditors including KEXIM.  KEXIM is informed and believes and on that basis alleges that ASI knew or should have known that their officers, employees and agents were or may have been unfit or incompetent to properly carry out their job duties, including those duties specified herein, and failed to adequately supervise their actions.

131.   As a result of the negligent supervision by ASI of their officers, employees and agents, ASI was enabled to take the actions described above including, among other actions:

      a.  entering into the Supply Agreement with Moneual on unmeetable or onerous terms calling for the minimum purchase of hundreds of millions of dollars of Moneual products;

      b.  furnishing KEXIM and credit rating agencies with ASI's financial statements which were largely inflated to reflect the voluminous fictitious and/or fraudulent transactions between ASI and Moneual;

      c.  issuing purchase orders for nearly 18,000 units of HTPCs at enormously inflated prices relative to their true value, enabling Moneual to use those purported purchase orders to induce KEXIM to enter into the EFA, progressively raise Moneual's credit limit to

1    $40 million, and ultimately advance that sum to Moneual against

2    fraudulent receivables;

3        d.  paying KEXIM in respect of Moneual's purported receivable on the

4    First Set of Purchase Orders, thereby enabling Moneual to construct

5    and prolong its deceptive scheme;

6        e.  suffering or permitting their executives, officers, and employees to

7    receive millions of dollars in bribes in the form of kickbacks from

8    Moneual; and

9        f.  assuring KEXIM on multiple occasions that ASI Computer had a

10    genuine business relationship with Moneual, that the purported

11    purchase orders that ASI Computer issued for Moneual products

12    were authentic and authorized, and that actions taken by Frances

13    Chou were "totally valid," all as set forth more particularly above.

14        132.   The negligence of ASI, as alleged above, proximately caused damage

15    to KEXIM in a minimum amount of $39,991,600, plus interest according to proof.

16    / / /

17

18

19

20

21

22

23

24

25

26

27

28

- 51 -

1
## **PRAYER FOR RELIEF**

2      WHEREFORE, KEXIM seeks judgment against defendants as follows:

3      1.  For compensatory damages according to proof, in the approximate

4          amount of $40,000,000;

5      2.  For interest thereon at the legal rate;

6      3.  On the First Claim for Relief, for exemplary damages according to proof;

7      4.  For its reasonable attorneys' fees;

8      5.  For its costs of suit; and

9      6.  For such other and further relief as the Court deems fit.

10   Dated:  February 13, 2018                    WHITE & CASE LLP

11

12

13                                             By:   */s/ Bryan A. Merryman*
                                                      Bryan A. Merryman

14

15                                             Attorneys for Plaintiff
                                               THE EXPORT-IMPORT BANK
16                                             OF KOREA

17

18
## **DEMAND FOR JURY TRIAL**

19          Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38-1, KEXIM

20   demands a trial by jury of all issues so triable.

21

22   Dated:  February 13, 2018                    WHITE & CASE LLP

23

24                                             By:   */s/ Bryan A. Merryman*
                                                      Bryan A. Merryman
25

26                                             Attorneys for Plaintiff
                                               THE EXPORT-IMPORT BANK
27                                             OF KOREA

28

- 52 -